IN RE HUSTON'S ESTATE. CARROLL, APPPELLANT, *v.* HUSTON, RESPONDENT.

(No. 3,360.)

(Submitted February 6, 1914. Decided February 24, 1914.)

[139 Pac. 458.]

*Domestic Relations—Husband and Wife—Marriage—Evidence of Cohabitation—Insufficiency—Presumption of Legality.*

Marriage—When Void.
1. A marriage contracted while the man had a wife living with whom he was at the time in correspondence relative to a divorce, of which fact, however, the woman was ignorant, was void under section 3612, Revised Codes.

[As to what marriages are void, see note in 79 Am. St. Rep. 361. As to rights of parties to void marriage, see notes in 96 Am. St. Rep. 267; Ann. Cas. 1913A, 236.]

Same—Evidence of Cohabitation—Insufficiency.

2. Evidence *held* insufficient to show that "public assumption of the marital relation" which the law (sec. 3607, Rev. Codes) demands in the absence of a solemnization, in order to constitute a valid marriage, it appearing that the cohabitation of the parties was clandestine.

[As to what constitutes common-law marriage, see notes in 124 Am. St. Rep. 104; Ann. Cas. 1912D, 597.]

Same—Validity of, in Sister State—Effect of, in Montana.

3. Under section 3614, Revised Codes, recognizing as valid all marriages entered into without this state, if valid under the laws of the state or country in which they were contracted, evidence of cohabitation *held* sufficient to create a presumption of a legal marriage in the state of Washington; hence the status of the parties in this state was that of husband and wife.

[As to foreign marriages, see note in Ann. Cas. 1912C, 625.]

*Appeal from District Court, Silver Bow County; Michael Donlan, Judge.*

FROM an order granting the petition of Annie B. Huston to administer upon the estate of Robert G. Huston, deceased, and revoking special letters therefor granted to J. L. Carroll, the latter appeals. Affirmed.

*Mr. Lewis A. Smith,* for Appellant, submitted a brief, and argued the case orally.

Where it is proved that a man and woman were legally married; that the marriage was never dissolved in the jurisdiction in which they lived, and that she has no personal knowledge of his obtaining a divorce, the presumption is that a second marriage contracted by him during her life is void. (*Cole* v. *Cole,* 153 Ill. 585, 38 N. E. 703; *Barnes* v. *Barnes,* 90 Iowa, 282, 57 N. W. 851.)

According to all the evidence, we have here an absolutely void marriage being secretly guarded by both parties to it during all the time they were in Montana. So it seems certain that in Montana there never was that "personal relation arising out of a civil contract to which the consent of the parties capable of making it is necessary * * * followed by * * * mutual and public assumption of the marital relation." (Sec. 3607, Rev. Codes; *O'Malley* v. *O'Malley,* 46 Mont. 549, 129 Pac. 501; *Kilburn* v. *Kilburn,* 89 Cal. 46, 23 Am. St. Rep. 447, 26

Pac. 636; *Quackenbush* v. *Swortfiguer,* 136 Cal. 149, 68 Pac.
590; *Hinckley* v. *Ayres,* 105 Cal. 357, 38 Pac. 735; *Harron* v.
*Harron,* 128 Cal. 303, 60 Pac. 932; *Sharon* v. *Sharon,* 79 Cal. 633,
22 Pac. 26, 131.) The legislature of California has, since the
last case cited above, wisely done away with the so-called com-
mon-law marriage, as has New York and many other states.

The validity of a marriage is determined by the law of the
place where it is celebrated. (*Clark* v. *Clark,* 52 N. J. Eq. 650,
30 Atl. 81; *Patterson* v. *Gaines,* 47 U. S. 550, 12 L. Ed. 553;
*In re Tabor,* 31 Misc. Rep. 579, 65 N. Y. Supp. 571; *Phillips* v.
*Gregg,* 10 Watts (Pa.), 158, 36 Am. Dec. 158.) The Toledo
marriage having been void from the beginning, it could not be
ratified. (Sec. 3612, Rev. Codes; *Petitt* v. *Petitt,* 105 App. Div.
312, 93 N. Y. Supp. 1001; *Wilbur's Estate* v. *Bingham,* 8 Wash.
35, 40 Am. St. Rep. 886, 35 Pac. 407.)

*Mr. B. K. Wheeler,* and *Messrs. Canning & Geagan,* for Re-
spondent, submittted a brief; *Mr. Wheeler* argued the cause
orally.

There is no evidence in this case that the so-called first mar-
riage was a legal one or that Sarah E. Huston was legally com-
petent to marry, or that Robert G. Huston, the person whom
she claims to have married, is the same person whose estate is
now in question. The burden is upon the appellant to prove
a valid prior marriage; this he has not done. (*Gaines* v. *Relf,*
12 How. (U. S.) 472, 13 L. Ed. 1071; *Bowman* v. *Little,* 101
Md. 273, 61 Atl. 223, 657, 1084; *Resnick* v. *Resnick,* 126 Ill. App.
132; *United States* v. *Green,* 98 Fed. 63.) If there was a prior
valid legal marriage existing between deceased and Sarah E.
Huston, the court was justified in finding that it had been dis-
solved by divorce. In *Teter* v. *Teter,* 101 Ind. 129, 51 Am.
Rep. 742, the court said: "The presumption in favor of matri-
mony is one of the strongest known to the law. The law pre-
sumes morality and not immorality, marriage and not concu-
binage, legitimacy and not bastardy." (*In re Rash's Estate,* 21
Mont. 170, 69 Am. St. Rep. 649, 53 Pac. 312.) In the following

cases it has been held that where a former marriage is shown to exist, it will be presumed that the same has been dissolved by death or divorce: *Teter* v. *Teter*, 101 Ind. 129, 51 Am. Rep. 742; *Pittinger* v. *Pittinger*, 28 Colo. 308, 89 Am. St. Rep. 193, 64 Pac. 195; *Klein* v. *Laudman*, 29 Mo. 259; *Greensborough* v. *Underhill*, 12 Vt. 604; *Hunter* v. *Hunter*, 111 Cal. 261, 52 Am. St. Rep. 180, 31 L. R. A. 411, 43 Pac. 756; *Johnson* v. *Johnson*, 114 Ill. 611, 55 Am. Rep. 883, 3 N. E. 232.

Where parties incompetent to marry enter into a marriage contract with a manifest desire and intention to live in a matrimonial union rather than in a state of concubinage, and the obstacle of their marriage is subsequently removed, their continued cohabitation raises a presumption of an actual marriage immediately after the removal of the obstacle and warrants a finding to that effect. (*The Breadalbane Case* (*Campbell* v. *Campbell*), L. R. 1 Scotch App. 182, 206; *De Thoren* v. *Attorney General*, L. R. 1 App. Cas. 686; *Fenton* v. *Reed*, 4 Johns. (N. Y.) 52, 4 Am. Dec. 244; *Hynes* v. *McDermott*, 91 N. Y. 451, 43 Am. Rep. 677; *In re Taylor*, 9 Paige Ch. (N. Y.) 611; *Gall* v. *Gall*, 114 N. Y. 109, 21 N. E. 106; *Donnelly* v. *Donnelly's Heirs*, 8 B. Mon. (Ky.) 113; *State* v. *Worthingham*, 23 Minn. 528; *Floyd* v. *Calvert*, 53 Miss. 37; *Jones* v. *Jones*, 45 Md. 144; *Yates* v. *Houston*, 3 Tex. 433; *Barnes* v. *Barnes*, 90 Iowa, 282, 57 N. W. 851; *Adger* v. *Ackerman*, 115 Fed. 124, 52 C. C. A. 568.)

Counsel lays stress on the fact that the deceased made declarations to disprove his marriage, but by the weight of authority such declarations are inadmissible, and went in evidence over objection of counsel. (See *Thompson* v. *Nims*, 83 Wis. 261, 17 L. R. A. 847, 53 N. W. 502; *Moore's Estate*, 9 Pa. Co. Ct. 338; *Hull* v. *Rawls*, 27 Miss. 471; *In re James*, 124 Cal. 653, 57 Pac. 578, 1008.)

Counsel seems to contend that the mutual public assumption must be in Montana, but the court cannot take such a contention seriously. Supposing the parties consented in Montana to be husband and wife and immediately went to the state of Washington and there publicly and mutually assumed the marriage

relation, could it be said that the public acknowledgments in Washington could not be used in evidence to prove the marriage in Montana? In the case of *Moore* v. *Heineke*, 119 Ala. 627, 24 South. 374, it was held that cohabitation in a state where common-law marriages are not recognized may be considered in connection with cohabitation in the state where such marriages are valid in determining the question of marriage. (*In re Dystart Peerage*, L. R. 6 App. Cas. 489.)

MR. JUSTICE HOLLOWAY delivered the opinion of the court.

Robert G. Huston, a resident of Butte, died intestate in Seattle, Washington, on November 1, 1912. Thereafter two petitions were presented to the district court of Silver Bow county, each asking for the appointment of an administrator of the estate—one by a person claiming to be the surviving wife and the other on behalf of a nonresident sister of the deceased. Pending the final determination, appellant was appointed special administrator. The two petitions were heard together, and the result of the trial was an order granting the petition of respondent, denying the petition of the sister and revoking the special letters theretofore granted to appellant. There is an appeal from the order, and the only question for determination is the sufficiency of the evidence to warrant it. There is not any substantial dispute as to the facts.

In the fall of 1910 Huston and Mrs. Annie B. King—a divorced woman—left Butte together for the national encampment of the G. A. R. at Atlantic City, New Jersey. They stopped in [1, 2] Toledo, Ohio, and there were married by a Methodist minister according to law. They continued their journey, living and cohabiting together as husband and wife. Huston returned to Butte almost immediately, but the woman stopped in Michigan until the following March. During this period of separation many letters passed between them, and in practically every one written by Huston he referred to the woman as his wife and addressed her in the most endearing terms. In March,

1911, she returned to Butte and took up her residence in the Penn Block, in which block Huston had his business office and his living room. A part of the time thereafter Huston occupied her apartments with her; took his meals with her most of the time; paid her room rent and store bills, and was in her company upon the streets, at the markets and theaters a great deal. · To three or four acquaintances Huston told that he and the former Mrs. King were married, but to two of these at least the information was imparted in confidence and from them a pledge of secrecy was exacted. To one or two other persons he referred to the woman as his wife, but to his business associates and to the public generally he invariably referred to her as Mrs. King, and the fact that they were cohabiting together was kept a profound secret so far as they were concerned. This course of conduct was pursued until Huston left for the coast in September, 1912. In October following he became confined in the Providence Hospital, Seattle, where he died. About the time he went to the hospital he sent for the former Mrs. King to come to him, and with his letter inclosed a check for $100 to defray her expenses. The check was made payable to Annie B. King, and was cashed by her by indorsing the name ''Annie B. King.'' She immediately left Butte and arrived in Seattle on October 19 or 20. On the following morning she took up her abode at the hospital and until Huston's death gave him every attention that a wife could bestow upon her husband. Upon her arrival Huston introduced her to the hospital attendants and to others as his wife; was introduced by her to her friends as her husband, and in return recognized her to them as his wife. She occupied the same room with him during the time they were at the hospital, and for the last nine days of his life her attention to him was so constant that, to use her language, she did not undress during that time. This, in very general terms, covers the principal points of the evidence of their relationship.

At the time the marriage ceremony was performed in Toledo Huston had a wife—Elizabeth—living in Portland, Oregon. He

knew her address and was then in correspondence with her relative to a divorce. Of these facts, however, Mrs. King was ignorant until after Huston's death. He represented to her that he had been divorced, and she entered into the marriage relationship in good faith, believing a valid marriage had been contracted. She had entered public land in the name of Annie B. King and sought to keep the marriage a secret until she could make final proof. In May, 1911, Elizabeth Huston secured a divorce in Oregon.

Section 3612, Revised Codes, provides: "A subsequent marriage contracted by any person during the life of a former husband or wife of such person, with any other person than such former husband or wife, is illegal and void from the beginning, unless: 1. The former marriage has been annulled. 2. Unless such former husband or wife was absent, and not known to such person to be living for the space of five successive years immediately preceding such subsequent marriage, or was generally reputed and was believed by such person to be dead at the time such subsequent marriage was contracted; in either of which cases the subsequent marriage is valid until its nullity is adjudged by a competent tribunal."

So far as the Toledo ceremony is concerned, it is of no aid to respondent in her attempt to establish her claim as the surviving widow of Robert G. Huston, deceased, by a marriage contracted prior to the trip to Seattle in October, 1912. Whatever may be said of the evidence as to their conduct to each other in Butte after May, 1911, when Huston's disability was removed, this fact is indisputable: that their assumption of the marital relationship—their cohabiting as husband and wife—was clandestine.

Section 3607, Revised Codes, provides: "Marriage is a personal relation arising out of a civil contract, to which the consent of parties capable of making it is necessary. Consent alone will not constitute marriage; it must be followed by a solemnization, or by mutual and public assumption of the marital relation." At the time the ceremony was performed in Toledo,

Huston was incapable of contracting a valid marriage. There was not any further ceremony performed for them in Montana, and assuming that they mutually agreed upon their immediate marriage as soon as the disability was removed, the evidence above is insufficient to show that public assumption of the marital relation which our statute demands.

Section 3614, Revised Codes, provides: "All marriages contracted without the state, which would be valid by the laws [3] of the country in which the same were contracted, are valid in this state." If, then, these parties were married in Washington, the courts of this state will recognize the relationship, even though it be such a marriage as that, if contracted in this state, it would not be valid under our laws. The question before us is: Are the facts above enumerated sufficient to make out a *prima facie* case of marriage in Washington? The statutes of that state are not before us, and it is insisted by appellant that a common-law marriage is not valid there.

In 1892 the question of the validity of a common-law marriage in Washington was presented to the supreme court, apparently as one of first impression in that jurisdiction. An elaborate opinion was prepared and the conclusion reached that the statutes contemplate a ceremonial marriage only, and that a common-law marriage is not valid there. (*In re McLaughlin's Estate,* 4 Wash. 570, 16 L. R. A. 699, 30 Pac. 651.) That decision is referred to in *Smith's Estate,* 4 Wash. 702, 17 L. R. A. 573, 30 Pac. 1059; in *Kelley* v. *Kitsap County,* 5 Wash. 521, 32 Pac. 554, and in *Wilbur's Estate,* 14 Wash. 242, 44 Pac. 262.

In *Summerville* v. *Summerville,* 31 Wash. 411, 72 Pac. 84, very slight evidence that a ceremony had been performed in British Columbia was held sufficient with evidence of cohabitation by the parties as husband and wife to establish a marriage.

In *Shank* v. *Wilson,* 33 Wash. 612, 74 Pac. 812, the date of a marriage was the question in issue. Appellants proved a ceremonial marriage celebrated on June 4, 1900. Respondent offered evidence that the parties had lived and cohabited together as husband and wife and held themselves out as such for sev-

eral years prior to that date. It was held that these facts raised a presumption that a valid statutory marriage had preceded such acts, and that this presumption was not overcome by positive proof of the marriage celebrated in June, 1900.

In *Nelson* v. *Carlson*, 48 Wash. 651, 94 Pac. 477, there was not any evidence whatever that a marriage ceremony had ever been celebrated between John Nelson and Christina Alida Carlson. The only evidence was that for several years before the woman's death they lived and cohabited as husband and wife, were recognized as such by their neighbors, that they joined in conveyances as husband and wife, and upon the death of the woman, Nelson had a headstone erected at the grave upon which her name was inscribed as Mrs. Nelson. The court held that this evidence was sufficient to establish the marriage. A somewhat similar case, with the same result, is *McDonald* v. *White*, 46 Wash. 334, 89 Pac. 891.

In the *McLaughlin Case* above the court said: "In all cases, whether common-law marriages are recognized or not, evidence of cohabitation and repute is admissible as tending to show a valid marriage; holding each other out as husband and wife to the public, and continued living together in that relationship has ordinarily, if not universally, been held sufficient proof, unless contradicted, to establish it, even within those states where common-law marriages are not recognized. This presumption could always be rebutted, however, by showing that the parties intended their connection to be illicit, and, if it was so intended at its commmencement, it is presumed to continue, unless evidence is produced of a change of mind." It then quotes, and apparently with approval, sections 970–975 and 979 from 1 Bishop on Marriage, Divorce and Separation.

In the *Summerville Case* above, the court quotes from 1 Bishop on Marriage, Divorce and Separation, section 956, as follows: "Every intendment of the law leans to matrimony. When a marriage has been shown in evidence, whether regular or irregular, and whatever the form of the proofs, the law raises a strong presumption of its legality; not only casting the burden of proof

on the party objecting, but requiring him throughout, in every particular, to make plain, against the constant pressure of this presumption, the truth of law and fact that it is illegal and void. * * * It being for the highest good of the parties, of the children and of the community, that all intercourse between the sexes in form matrimonial should be such in fact, the law, when administered by enlightened judges, seizes upon all probabilities, and presses into its service all things else which can help it, in each particular case, to sustain the marriage, and repel the conclusion of unlawful commerce." The court then concludes: "A valid marriage may be presumed to exist from general reputation among the acquaintances of the parties that such is the fact, when that reputation is accompanied by their cohabitation, and arises from their holding themselves out to the world as occupying that relation to which the law refers when marriage is mentioned."

In *Shank* v. *Wilson* the court said: "It is well-established law, not necessitating the citation of authority, that the proof of continual cohabitation of a man and woman, and of a continual assertion that the marriage relation exists, and proof of such conduct as is consistent with the marriage relation, raises the presumption in those states where the common-law marriage itself is not held to be a legal marriage, that the ceremonial or legal marriage has preceded the acts mentioned." It also reaffirms the doctrine announced in section 956 of Bishop as quoted in the *Summerville Case*.

In *Potter* v. *Potter*, 45 Wash. 401, 88 Pac. 625, the question whether there had been a marriage ceremony performed was in sharp dispute. The court again refers to the decision in the *Summerville Case* and says: "In a conflict of testimony such as is shown by the record in this case, it is well established that a ceremonial marriage may be proven by circumstances, such as the cohabitation of persons as husband and wife, their reputation and recognition as such in society, and that, when such circumstances are shown, the presumption of marriage exists, and the

burden is upon the party denying the marriage to show that the ceremony had never been performed.''

In *Sloan's Estate*, 50 Wash. 86, 17 L. R. A. (n. s.) 960, 96 Pac. 684, the court said: ''The presumption of marriage, from a cohabitation, apparently matrimonial, is one of the strongest presumptions known to the law. This is especially true in a case involving legitimacy. The law presumes morality and not immorality; marriage and not concubinage; legitimacy and not bastardy. Where there is enough to create a foundation for the presumption of marriage, it can be repelled only by the most cogent and satisfactory evidence.''

In *Thomas* v. *Thomas,* 53 Wash. 297, 101 Pac. 865, the language of section 956 from Bishop, quoted in *Shank* v. *Wilson,* and in *Summerville* v. *Summerville,* is again reproduced with approval.

Finally, in *Weatherall* v. *Weatherall,* 56 Wash. 344, 105 Pac. 822, all the preceding cases are reviewed at length and the court sums up its conclusion upon the status of the law in Washington, as follows: ''We have reviewed the cases in this court for the purposes of showing that there is no real conflict between the earlier and later ones on this subject. We have seen that in the *McLaughlin Case* it was stated by Judge Scott that, in the states where common-law marriages are held invalid, a lawful ceremonial marriage may be presumed from cohabitation and reputation. The logic of that case has been liberally applied to the facts in the later cases to uphold the marriage relation, where the parties have lived together as husband and wife, and held themselves out to the public as sustaining that relation.  *  *  * Whilst language may be found in some of the earlier cases which tends to support the judgment, the uniform and unbroken current of opinion in this court, as we read the cases, has been that, while a common-law marriage is invalid in this state, evidence of cohabitation and reputation is admissible for the purpose of raising the legal presumption of a prior ceremonial marriage.'' While in the earlier cases it was held that there could not be a common-law marriage in Washington, in *Willey* v. *Willey,* 22

Wash. 115, 79 Am. St. Rep. 923, 60 Pac. 145, the validity of a common-law marriage contracted in California was upheld in Washington; and in *In re Hollopeter*, 52 Wash. 41, 132 Am. St. Rep. 952, 17 Ann. Cas. 91, 21 L. R. A. (n. s.) 847, 100 Pac. 159, where there was involved the validity of a marriage between Grover, a youth of nineteen, and Imogene, a girl of fourteen, without parental consent, the marriage was upheld and the court said: "Imogene was within the common-law age of consent, so that we cannot hold as a matter of law, as did the lower court, that she was incapable of consenting to the marriage." And this in the face of a statute which provides: "Marriage is a civil contract which may be entered into by males of the age of twenty-one years, and females of the age of eighteen years who are otherwise capable." (Rem. & Bal. Ann. Codes of Washington, sec. 7150 (4467).) If the evidence of this case had been presented to the courts of Washington, we are satisfied that they would have held it sufficient to create a presumption that Huston and Mrs. King had been legally married.

The same authorities cited by the Washington court in the cases above were cited and relied upon by this court in *Hadley* v. *Rash*, 21 Mont. 170, 69 Am. St. Rep. 649, 53 Pac. 312, where was called in question the validity of the second marriage of Daniel Rash. The court held that evidence that Rash had married the second wife and had lived and cohabited with her would raise the presumption of a divorce from the first wife and a valid second marriage. "That a man and a woman deporting themselves as husband and wife have entered into a lawful contract of marriage" is one of the presumptions declared by section 7962, Revised Codes (30).

Because in our opinion the evidence is sufficient to disclose a marriage valid in Washington at the time of Huston's death, we are compelled to recognize this respondent as his surviving widow. For this reason the order above is affirmed.

*Affirmed.*

Mr. Chief Justice Brantly and Mr. Justice Sanner concur.