In re TAKAHASHI'S ESTATE. BRITELL et al., Appellants, v. JORGENSEN, Public Administrator, Respondent.

(No. 8,290.)

(Submitted April 7, 1942. Decided September 23, 1942.)

[129 Pac. (2d) 217.]

*Messrs. Walchli & Korn, Mr. C. W. Gribble* and *Mr. Merritt N. Warden,* for Appellant, submitted a brief; *Mr. Hans Walchli* argued the cause orally.

*Mr. Rock D. Frederick,* for Respondent, submitted a brief.

MR. JUSTICE ANDERSON delivered the opinion of the court.

This is an appeal from an order appointing the administrator of an estate.

The deceased, Shun T. Takahashi, was a Japanese alien who died in Flathead county, Montana, on July 23, 1941. The public administrator, James Jorgensen, Jr., applied for letters of administration. The application was opposed by Vivian Takahashi, a white woman, claiming as surviving widow of the deceased, and asking for the appointment of Claude C. Britell as her nominee. The two petitions were heard together, each contesting the other. There was no will, and the deceased left prop-

erty within the jurisdiction of the court—a proper case for the appointment of an administrator—and the only question over which there was controversy was as to which of the two applicants was entitled to letters.

The public administrator in his petition refers to Vivian Takahashi, living at Havre, Montana, as the wife of the deceased, but alleges that she is a white woman and therefore was not his lawful wife and cannot claim any right of administration as his surviving widow. He alleges further that the only next of kin of the deceased is his father, Minomatsu Takahashi, residing in Japan, and that therefore, as public administrator he is entitled to letters.

Vivian Takahashi in her petition alleges that she is the surviving widow of the deceased, and that as such she is entitled to letters of administration, and, waiving such right, her nominee is entitled to letters. If she is the surviving widow she should prevail, and the controversy narrows down to the question of the validity of the marriage between her and the deceased.

Upon the hearing the court made an order granting the petition of the public administrator and ordering letters of administration to issue to him. The order did not specifically deny the petition of Vivian Takahashi but that was its effect. From the order so made, Vivian Takahashi and Claude C. Britell, her nominee, have appealed.

To sustain her case, Vivian Takahashi showed that she and the deceased were married in Spokane, Washington, on May 18, 1915. In addition to her testimony to that effect there was a written stipulation that they were duly married under the laws of Washington at Spokane on May 18, 1915, that marriage between a white person and a Japanese was not prohibited by the laws of that state, and that the marriage was there legal and valid. The only question left for determination is whether that marriage may be held valid in Montana.

Marriage between a Japanese and a white person is prohibited in this state. Section 5702, Revised Codes 1935, declares such marriage "utterly null and void" and official solemnization is

494

prohibited with penalty of fine and imprisonment. (Sec. 5704, Id.) The ban applies not only to marriages contracted within the state but is extended to apply to marriage of residents of the state contracted elsewhere, section 5703 providing that "every such marriage * * * hereafter contracted or solemnized without the state of Montana by any person who has, prior to the time of contracting or solemnizing said marriage, been a resident of the state of Montana, shall be null and void within the state of Montana." This law was enacted in 1909 and has remained unchanged ever since.

The phrase "prior to the time of contracting or solemnizing said marriage," as here used, can refer only to the time immediately preceding the marriage. Given its widest meaning it would include any time previous to the marriage, even in the remote past and separated by intervening years of residence elsewhere. This would lead to questionable results, and would carry the reach of the legislation beyond the scope apparently intended by the legislature. In its application to foreign marriages, residence within the state is the condition of the law being applied. It is clear that it was not intended to apply generally to non-residents, and there is no reason to believe that the legislature intended to single out non-residents who had formerly resided in the state as being controlled by the law. The more reasonable view is that the language employed in speaking of prior residence in the state was intended to have the more restricted meaning as applying to the prior time immediately preceding the marriage.

In construing statutes, words employed should be given such meaning as is required by the context, and as is necessary to give effect to the purpose of the statute; and it is the duty of the court to restrict the meaning of general words whenever it is found necessary to do so in order to carry out the legislative intention. (*Northern Pac. Ry. Co.* v. *Sanders County,* 66 Mont. 608, 214 Pac. 596; *Reiche* v. *Smythe,* 13 Wall. 162, 20 L. Ed. 566; *Lau Ow Bew* v. *United States,* 144 U. S. 47, 12 S. Ct. 517, 36 L. Ed. 340; 25 R. C. L., Statutes, sec. 223.)

The only prior residence that can be material to the purpose of this law is that which transpires immediately preceding the event in case of marriage outside the state, this being taken as the criterion in determining the residence of the parties at the time the marriage takes place. So construed, we have a law which prohibits marriage in this state between Japanese and whites and which extends the ban to such marriage of its residents solemnized elsewhere as invalid within the state.

There is no contention that the state may not prohibit such marriages within its own borders, but question is raised as to the application of the law to marriages solemnized elsewhere. Appellants rely on the general rule that a marriage valid where made will be held valid everywhere, and to show that this rule is the law in Montana they cite section 5707 of the Revised Codes of 1935, which provides that ''all marriages contracted without the state, which would be valid by the laws of the country in which the same were contracted, are valid in this state.'' We find exceptions thereto, also by statute, among them, as provided by sections 5702 and 5703, Revised Codes, those which prohibit such marriages as here considered and by which they are declared to be absolutely null and void. Such marriages are thereby taken out of the general rule and are not governed by section 5707. (38 C. J. 1277.)

It is the policy of our law that there shall be no marriage between white presons and Japanese. To make that policy effective such marriage within the state is forbidden; and our own residents are not permitted to circumvent the law by marriage outside the state. Such marriage our law declares to be null and void and of no avail within the state.

A number of states have similar legislation prohibiting marriage between certain races, and such laws have been sustained by the courts. (*Kinney* v. *Commonwealth*, 30 Grat., Va., 858, 32 Am. Rep. 690; *State* v. *Fenn*, 47 Wash. 561, 92 Pac. 417, 17 L. R. A. (n. s.), 800; *Eggers* v. *Olson*, 104 Okl. 297, 231 Pac. 483. See, also, 38 C. J. 1217; 35 Am. Jur., Marriage, secs. 167, 173, 174.)

496

The control and regulation of marriage is a matter of domestic concern within each state. In the adoption of policies in respect thereto, which in its judgment are promotive of the welfare of its society and of the individual members thereof, the state is sovereign and not subject to the control of the Federal Government nor of the laws of any other state. (35 Am. Jur., Marriage, secs. 11, 167; 38 C. J. 1275; Restatement, Conflict of Laws, sec. 132; *Haddock* v. *Haddock*, 201 U. S. 562, 26 S. Ct. 525, 50 L. Ed. 867, 5 Ann. Cas. 1; *Toler* v. *Oakwood, etc., Corporation*, 173 Va. 425, 4 S. E. (2d) 364, 127 A. L. R. 430; *Hanson* v. *Hanson*, 287 Mass. 154, 191 N. E. 673, 93 A. L. R. 701; *Ex parte Soucek*, 7 Cir., 101 Fed. (2d) 405; *Murphy* v. *Murphy*, 249 Mass. 552, 144 N. E. 394.)

The rule of comity does not require that a state shall sanction within its borders that which is repugnant to its own law. The question has frequently arisen in connection with the regulation of marriage, and the complete sovereignty of each state in the determination of what marriages of its own residents it will sanction is the universal rule. (*Toler* v. *Oakwood, etc., Corporation*, supra.)

The case of *Cross* v. *Cross*, 110 Mont. 300, 102 Pac. (2d) 829 cited by appellants, is not in point. The marriage there under consideration was not void but only voidable. It was not a marriage prohibited by the laws of this state.

The general rule as to recognition of foreign marriage valid in the state where contracted is referred to and applied in a number of other decisions of this court. In none of those cases, however, was the marriage in question obnoxious to the laws of this state. In the case of *In re Huston's Estate*, 48 Mont. 524, 139 Pac. 458, there was no impediment to the marriage of the parties under our law, and a marriage between them in the state of Washington, legal and valid under the laws of that state, was sustained as valid in Montana. In the case of *Welch* v. *All Persons*, 78 Mont. 370, 254 Pac. 179, the reference to the rule there was in connection with a claimed marriage in the state of Wisconsin between parties who could have married in Montana.

None of those cases were within the exception to the rule where the marriage sought to be sustained is such as is forbidden by our law.

There should be no difficulty in understanding the legislative intent in referring to the residence of persons within the state as determinative of the application of the law. The word "resident" is generally understood as referring to a person in connection with the place where he lives. Webster's Dictionary defines the word as meaning "one who resides in a place; one who dwells in a place for a period of more or less duration." Our state Code defines "residence" as "the place where one remains when not called elsewhere for labor or other special temporary purpose, and to which he returns in seasons of repose." (Sec. 33, Rev. Codes). It also says that "the residence can be changed only by union of act and intent."

While the word "residence" has been involved in many controversies as will be seen from the reported cases, it will be found that it is not the word itself that has been difficult of understanding. It has been in the construction of language expressive of the effect of residence, and of the rights arising therefrom and based on the fact of residence. In each such case the word becomes a part of a concept larger than itself, such as residence necessary to the right to vote, residence in establishing a domicile, residence necessary to citizenship, etc. In each such case the context in connection with which the word is used must be considered, and the word, together with the context, then gives the meaning sought to be conveyed. There is thereby no change made in the simple, clear meaning of the word itself. (*In re Coppock's Estate,* 72 Mont. 431, 234 Pac. 258, 39 A. L. R. 1152; *Archer* v. *Archer,* 106 Mont. 116, 75 Pac. (2d) 783; *State ex rel. Duckworth* v. *District Court,* 107 Mont. 97, 80 Pac. (2d) 367.) The fact of residence, of course, must be determined in each case from the evidence adduced, and by the application thereto of ordinary rules of evidence.

In the instant case we have to determine the simple fact of "residence." The statute does not speak of any length of

residence, nor is there any other qualification specified. We need not be concerned with the residence of Vivian Takahashi prior to the time of the marriage. If Shun T. Takahashi was then a resident of Montana, the question of the validity of the marriage as it here arises is governed by the Montana law.

Shun T. Takahashi came to Troy, Montana, in 1912, where he ██ ██ was then employed by the Great Northern Railway Company as call boy and errand boy and later as laborer in the roundhouse. He continued in that employment there until 1927 when he was transferred to Whitefish, Montana, but still in the employ of the railway company, working in the roundhouse. He worked for the railway company in such employment continuously from 1912 until the time of his death in 1941. For a time he also had a restaurant in Troy, from 1922 until 1927 or 1928. Vivian Takahashi became acquainted with him in 1915 at Bonners Ferry, Idaho, where she was then working. The two towns were not a great distance apart, and after their acquaintance they visited back and forth. She was with Takahashi at Troy when they went to Spokane and were married. After that they lived together at Troy as husband and wife and were well known there. There was no evidence of either of them having been anywhere else than in Montana since the time of their marriage, except some trips made to Seattle, Washington, but always returning to Montana where Takahashi all the time was employed and part of the time was also running a restaurant, and where they lived and made their home. The history of their residence in the state is complete for more than a quarter of a century, including the time of their marriage. While it is the residence immediately prior to and at the time of the marriage that is of importance here, the long-continued residence thereafter in the same place is material as proving the permanent nature of the residence there already at the time of the marriage. (28 C. J. S., Domicile, sec. 17; 9 R. C. L. 557.)

In an attempt to show that Takahashi was not a resident of Montana at the time of the marriage, Vivian Takahashi testified several times that he had always told her his home was in Seattle,

but each time the testimony was stricken as hearsay; she then, still on direct examination, testified three times that she did not know where Takahashi's home was at the time of their marriage; asked again "Did he tell you where his home was?" she replied: "His home was in Seattle." The answer was objected to as hearsay and not ruled upon by the court, but it is apparent from the circumstances that she was testifying as to his own statement of his residence. The only other possible evidence of his residence other than in Montana was the certified copy of the marriage license showing that in making the application he stated that his residence was Seattle, Washington.

There was no evidence of Takahashi ever having lived in Seattle. His declarations alone, unsupported by any evidence of actual residence there, are of little, if any, value as evidence. (28 C. J. S., Domicile, sec. 18.) Actions speak lounder than words, and the conduct of the parties in this case leaves their statements and declarations in conflict therewith wholly without merit as evidence. (*In re Harkness' Estate,* 176 Cal. 537, 542, 169 Pac. 78, 80; *In re Thornton's Estate,* Cal. Sup., 19 Pac. (2d) 778.) Even though there had been substantial evidence of a former residence in the state of Washington, the conduct of both parties shows abandonment of such residence. Any floating intention they may have had of returning there could not have the effect of maintaining the residence there under the circumstances here shown. (17 Am. Jur., Domicile, sec. 31; *In re Thornton's Estate,* supra.) Vivian Takahashi further testified that Takahashi during all the time was also working for the Oriental Trading Company which had headquarters in Seattle, and that he went where he was ordered to go by such company. Upon his death, among his personal effects found, was a check on the Oriental Trading Company payable to him. What such work consisted of or what the check was for does not appear. This was no proof of residence. There was no substantial evidence to show that Takahashi was not a resident of Montana.

It is clear that the evidence as a whole does not preponderate

.against the district court's finding, necessarily implied by the .order appealed from, that at the time of the marriage Takahashi was a resident of Montana. Certainly we cannot hold that the ·court erred in that respect.

Appellants further contend that, regardless of the invalidity of the marriage at the time it was contracted, the relation having continued for twenty-six years and until Takahashi's death, it is too late for the public administrator to attack the .marriage; that a marriage cannot be attacked collaterally, or by .a stranger, but can be set aside only by a party during the lifetime of the parties. The answer to this contention is that marriage between these two parties was absolutely prohibited. Neither time nor circumstance could remove the legal objection .and obstacle thereto; nor could the marriage status afterward result from such cohabitation as followed. The marriage was void and ineffectual for any lawful purpose in this state. It is open to collateral attack in any proceeding wherein the question of its validity may be raised, whether before or after the .death of either or both of the parties. (35 Am. Jur., Marriage, .sec. 58; *In re Gregorson's Estate,* 160 Cal. 21, 116 Pac. 60, L. R. A. 1916 C, 697, Ann. Cas. 1912D, 1124.) The marriage was wholly non-existent, and there was no occasion ever for any pro-·ceeding to have it annulled. The public administrator was in no way concerned until after the death of Takahashi, and it was .entirely proper that he should show then that there had been no valid marriage between these parties.

Vivian Takahashi's claim of right of administration rests en-·tirely upon her claim of marriage with the deceased. Inasmuch as that marriage was entirely null and void and must be :treated as wholly non-existent in this state, she is without any .claim of right of administration. There were no children of the marriage, and the evidence showed that the only next of kin ·was a surviving brother of the deceased, living in Japan, the father referred to in the petition having died. The public ad--ministrator is, therefore, entitled to letters of administration.

'The order of the lower court is affirmed.

MR. CHIEF JUSTICE JOHNSON and ASSOCIATE JUSTICE ERICKSON concur.

MR. JUSTICE ANGSTMAN takes no part in the foregoing decision.

MR. JUSTICE MORRIS:

I dissent. The general rule relative to residence is provided for by section 33, Revised Codes, which, so far as pertinent here, provides:

"Every person has, in law, a residence. In determining the place of residence the following rules are to be observed:

"1. It is the place where one remains when not called elsewhere for labor or other special or temporary purpose, and to which he returns in seasons of repose.

"2. There can only be one residence.

"3. A residence cannot be lost until another is gained. * * *

"7. The residence can be changed only by the union of act and intent."

The residence or domicile of the marriage contracting parties —the vital question to be determined in this action—on the date of their marriage, May 18, 1915, at Spokane, Washington, must control our conclusions as to their residence. Where they lived subsequent to marriage has no bearing on the merits of this action.

It is shown by both the application for marriage license and by the certificate of marriage that both the contracting parties claimed residence in other states: the man in the state of Washington and the woman in the state of Oregon. This written evidence, combined with the testimony of Mrs. Takahashi, is the best and practically the only evidence in the record as to the domicile or residence of the parties.

"The general rule is that domicile is changed from one place to another, or one state to another, only by abandonment by a person of his first place of domicile with intention not to return, and by taking up his residence in another place with the intention of permanently residing in that place. In other words,

to effect a change of residence or domicile, there must be an actual abandonment of the first domicile, coupled with intention not to return to it, and there must be a new domicile acquired by actual residence in another place or jurisdiction, with the intention of making the last acquired residence a permanent home." (9 R. C. L. 542.)

The evidence in the record before us is ample to establish the actual residence of the parties in Montana for some two or three years prior to their marriage, but the record is entirely and absolutely void of any showing that either party intended to abandon his or her former residence in Washington and Oregon. Our statute, quoted above, says that residence can be changed "only by the union of act and intent." The case of *United States* v. *Knight,* 9 Cir., 299 Fed. 571, 573. a Montana case, was a suit brought by the United States against Sidney E. Knight to cancel his certificate of citizenship. Knight was an Englishman and was admitted to citizenship in the United States in Lewis and Clark county, state of Montana, November 5, 1900. Within five years thereafter he went to South Africa in the employ of an American corporation, remaining in that country and in such employment for more than twenty years, and it appears that he took part in political affairs in South Africa and voted there but always maintained that he was an American citizen and registered with the American consul general at Capetown, South Africa, as an American citizen. The action brought against him was for the purpose of cancelling his certificate of citizenship on the ground of fraudulent representation. The federal district court held that it was not shown that the defendant had taken permanent residence in South Africa and dismissed the action; on appeal to the circuit court, the district court's decision was affirmed. In the course of the opinion of the circuit court it was said:

"An American cttizen does not become a permanent resident of a foreign country by simply taking employment there with an American firm, however long his employment may continue."

It appears that Takahashi was connected with the Oriental

Trading Company of Seattle, Washington, and obviously continued in the employment of that concern at least to some extent during all the time down to the time of his death, as a check recently issued by that company to him, apparently for wages, was in his possession and was listed among the assets in the inventory of his property. He had an absolute right to maintain his residence in the state of Washington for any length of time that he might desire, and there is no evidence in the record to show that he ever intended to relinquish his legal residence in that state.

In order to keep within the statute, there must be shown not only that he resided in Montana during the time alleged, but that it was his intention to abandon his residence in the state of Washington. When it comes to the matter of his marrying, the only evidence that we have as to his intention in regard to his residence is the information given to the Washington officials at Spokane when he obtained his marriage license, and at that time he gave his place of residence as Seattle, Washington. It is so well established that one may maintain a legal residence separate and apart from his actual place of abode that I do not deem it necessary to present authorities on that point. Personally, the writer left Havre, Montana, nine years ago and took up his abode in the city of Helena, yet has maintained legal residence at Havre and voted there. We all know that our senators and congressmen and numerous other persons employed in the federal service maintain their residences at places other than the places where they actually live while in the service of the federal government. The right that such people have to maintain a legal residence in one place while actually living in another is a right that any other person may exercise as well as public officials.

Our statute prohibits marriage between a white person and a Japanese, as stated by the majority, but there is no such law in the state of Washington, and Takahashi and his wife were legally married in the state of Washington and their civil contract would be sustained in every particular under the statutes

of that state. And their marriage in the state of Washington and return to Montana, is not, in my opinion, a violation of section 5703, which provides that if a marriage contract is solemnized without the state of Montana by any person who has, prior to the time of contracting such marriage been a resident of this state, shall be void in this state. The residence referred to in section 5703 is a legal residence of the party, not the particular place where he may be employed or where he earns his living. Section 5707 provides: ''All marriages contracted without the state, which would be valid by the laws of the country in which the same were contracted, are valid in this state.'' The parties complied with every lawful requirement of the state of Washington when they entered into their contractual marriage relation, and under our statute we have no power to deny to Mrs. Takahashi all the rights, privileges and immunities of that relation.

The fact that the two parties lived in Troy and went to Spokane to be married has no significance and was a perfectly natural act. Troy is located in the west part of the state and is much nearer to Spokane than any city of importance in Montana, and it was a perfectly natural act for the parties to go there to be married. There is nothing whatever in the record to show that either of them was cognizant of the fact that their marriage was prohibited under the laws of Montana, and while the rule is that all persons are presumed to know the law, this presumption cannot properly be applied as the basis for charging one with fraudulent intent unless it is shown that the parties so charged did have actual knowledge of the law, and even if they did know they could not legally enter into a marriage contract in Montana, such fact would not vitiate their marriage contract in the state of Washington.

The order of the trial court should be reversed and the petition of Vivian Takahashi for the appointment of her nominee as administrator should be granted, in the absence of any other ground than that mentioned which could be advanced in opposition to his appointment.