[No. 15788.   In Bank.—January 2, 1895.]

FLORENCE BLYTHE HINCKLEY, RESPONDENT, *v.* ABBIE AYRES ET AL., DEFENDANTS.   ALICE EDITH BLYTHE, APPELLANT.

MARRIAGE WITHOUT SOLEMNIZATION — EVIDENCE. — There can be no mutual assumption of marital rights, duties, and obligations, within the meaning of section 55 of the Civil Code, so as to constitute a marriage without solemnization, unless the parties live together as husband and wife, treat each other in the usual way with married people, and so conduct themselves as to have full repute among their intimate friends and associates to be husband and wife. Tested by this rule, *held*, that the evidence sustained the finding of the trial court that the appellant and the deceased did not live together as husband and wife.

APPEAL from an order of the Superior Court of the City and County of San Francisco refusing a new trial.

The facts are stated in the opinion of the court.

*Henry E. Highton,* and *E. D. Wheeler,* for Appellant.

*W. H. H. Hart, T. I. Bergin, Garber, Boalt & Bishop, W. W. Foote,* and *H. I. Kowalsky,* for Respondent.

McFARLAND, J.—This case is a branch of the litigation which arose out of the settlement of the estate of Thomas H. Blythe, deceased. The general history of that litigation, and the leading facts upon which it was founded are sufficiently stated in the opinions of the court in *Blythe* v. *Ayres,* 96 Cal. 532, and *Blythe* v. *Ayres,* 102 Cal. 254; and they need not be here repeated. The present appeal is taken by defendant, "Alice Edith Blythe" (so called in the transcript by order of the lower court), from an order denying her motion for a new trial. She claims to have been the lawful wife of said Thomas H. Blythe, deceased, at the time of his death, and to be now his widow. The court found against this claim. She also contends that the respondent, Florence Blythe, is not the daughter of said Thomas H. Blythe, deceased; and the court found against this contention.

The elaborate brief of her counsel, covering four hundred and thirty-eight pages, has two main divisions. In "division 1" it is contended that the evidence is insufficient to support the finding that respondent is the daughter of said Blythe, deceased; and in "division 2" that the evidence is insufficient to support the finding that appellant was not the lawful wife of said deceased.

1. With respect to the contention made in said division 1 of the brief it is sufficient to say that there is nothing in the evidence presented in the transcript on this appeal, or in the argument of counsel, that changes or affects the conclusion reached on the former appeals on the subject of the paternity of the respondent. There was evidence sufficient to support the finding of the lower court that she is the daughter of the deceased; and we do not care to say any thing more on the subject than was said in the opinions delivered in the said cases of *Blythe* v. *Ayres*, 96 Cal. 532; 102 Cal. 254.

2. It is not to be wondered at that counsel contend strenuously for their second proposition, viz., that appellant was the wife of the deceased. For if she was not his wife, then, notwithstanding the fact that she gave to him the best years of her life, and appears to have contributed more to his comfort and happiness than any other person mentioned in the record, she will be left without a dollar of his vast estate. If he had made a will, and left her a large share of his ample fortune, he would thereby have done an act as commendable, at least, as any other act of his life which the evidence shows. But courts cannot control the disposition of property, otherwise than as the law directs. They cannot take property from its lawful owners and give it to others according to their own notions about its proper distribution.

The trial court found that "said Thomas H. Blythe was never married to the defendant, styling herself in her answer herein as and by the name of Alice Edith Blythe, widow of said Thomas H. Blythe, deceased"; but that for a certain period before his death she did cohabit

with him as his mistress, and in no other character or
capacity. And, putting the case in the most favorable
light for appellant, the pivotal question is really one of
fact, and presents itself in this form: Was there suffi-
cient evidence to warrant the court in finding that from
about April 1, 1880, until the death of the deceased on
April 4, 1883, the appellant and deceased did not live
together and cohabit as husband and wife? Of course,
the court may not have believed that any contract of
marriage had ever been made between said persons. It
may be also that their living together as husband and
wife during said period would not have constituted mar-
riage, because it is not pretended that there was any
contract of marriage later than two years prior to the
commencement of said period; and in the mean time
they had meretricious intercourse.° But we are passing
over these questions, and putting the case most favor-
ably to appellant.

The appellant testified that on or about May 19, 1878,
in a certain cottage at the corner of Dupont and Geary
streets, in the city of San Francisco, which she had pro-
cured from the deceased, she and said deceased, no
other person being present, joined hands, and used cer-
tain language to each other, the substance of which was
that he promised to be her husband, and she prom-
ised to be his wife. She, before that, had been a mar-
ried woman, and had been divorced. He lived in his
house or apartments at No. 6 O'Farrell street in said
city. From that time on they had sexual relations; but
there can be no pretense that for the next two years
there was between them any "mutual assumption of
marital rights, duties, or obligations." He continued
to live at No. 6 O'Farrell, and during the two years she
lived at a half dozen or more different places. She
testified that during said time she frequently went to
No. 6 O'Farrell, when she had the opportunity, and
stayed there over night with the deceased. Counsel for
appellant do not contend that there was an assumption
of the marriage relation at or near the time of said al-

leged consent and agreement to be married; but they seem to suggest that during the next two years there was a sort of gradual, unfolding, evolutionary *progress* toward assumption. We dismiss this part of the case, by saying, that there is nothing to show any thing like an assumption of the marriage relation prior to the spring of 1880, when appellant went to live with the deceased at said No. 6 O'Farrell.

About April 1, 1880, the appellant commenced to live with deceased at his said house at 6 O'Farrell, and lived there with him until October, 1882, when they removed to No. 27 Geary street, where they lived until the death of the deceased on April 4, 1883.

There is no need here of discussing the law of marriage without solemnization, or the question, What constitutes a "mutual assumption of marital rights, duties, or obligations"? within the meaning of section 55 of the Civil Code. The law on that subject is sufficiently settled for the purposes of the case at bar in *Sharon* v. *Sharon*, 79 Cal. 633; *White* v. *White*, 82 Cal. 427; *Kilburn* v. *Kilburn*, 89 Cal. 46; 23 Am. St. Rep. 447; *People* v. *Beevers*, 99 Cal. 286, and other cases. There is no such assumption, unless the parties live together *as husband and wife*, treat each other "in the usual way with married people," and so conduct themselves as to have full repute among their intimate friends and associates to be husband and wife. And, applying the law as declared in the cases above cited, the question in the case at bar is whether the court was justified by the evidence in finding that the deceased and appellant did *not* so live together as husband and wife. And we are satisfied that the evidence was sufficient to warrant the conclusion reached by the court below, and that, under the well-established rule as to conflict of evidence, we cannot here disturb that conclusion.

The evidence upon the subject covers a great many hundred pages of the four large volumes of the transcript, and it is impracticable to notice any considerable part of it in this opinion. But as the case is an

important one, both as to personal and property rights, we will refer to some of the evidence and facts in proof, which tend to support the finding of the court below.

At the outstart one is struck with the wonderful dearth of lady visitors at the residence of the deceased and appellant. A married woman living in the usual way with a man who beyond any doubt or suspicion is her husband, no matter how humble her surroundings, has almost invariably some friends and visitors of her own sex. Entire isolation from such visitors is exceptional in the highest degree. The appellant in the case at bar appears to have been an agreeable and attractive woman, well educated, and having considerable musical and artistic tastes and capabilities. She was living with a man of wealth; and, if the relations between them had been reputed to be that of marriage, it is difficult to imagine why she did not have a number of respectable women among her associates and visitors. But, practically, she had none—after she commenced to live openly with the deceased at his house.

When determining whether a man and woman were living together as husband and wife we look mainly to those who knew most about the situation, who were the most intimate with them, who had the best opportunity to observe their conduct towards each other, and who knew best what their relation was reputed to be. And, naturally, they are those who have been social visitors to, and inmates of, the house where the persons in question lived.

The visitors to the house were gentlemen, and there were not very many of them. As counsel for appellant say: "There was but little company at 6 O'Farrell. Mr. Blythe's visitors there were gentlemen who called to see him about his Mexican property." But some of them were, or became, quite intimate social acquaintances and quite familiar with the house and its occupants. The most intimate of these was the witness General Andrade. He had visited the house in question very often, and finally, at the request of the

deceased, took up his quarters there, and lived there permanently for three months at one time in 1882. He slept and took his lunch and dinner there. Appellant ate at the table with him and deceased, and sang and played for them in the evening. Sometimes Mr. Yberri, another friend and visitor, was also there. Andrade, therefore, had the most ample opportunity of observing and knowing the relations of the parties; and he testifies that he always knew her as Miss Dickason and not as Mrs. Blythe; that Blythe called her "Alice" or "dear Alice," or "my child," and that he heard him introduce her as "Miss Dickason, my niece." In a letter written by him to Blythe a short time before the latter's death he speaks of the appellant as "Miss Dickason." The appellant herself, when testifying, was asked: "Did he (Blythe) ever introduce you to General Andrade as his wife"? and answered, "Mr. Andrade thought I was his niece."

The witness Jeffers was also an old and intimate acquaintance of the deceased "in business and social affairs." He first met appellant at lunch at No. 6 O'Farrell. He said she "was addressed as Miss Dickason, and that is the name I have since known her by." He says that in July or August, 1882, he went to see Blythe when the latter was sick, at said No. 6. When he first entered the room the appellant was there, but shortly afterward went out. The witness testified that, "Then I said to Mr. Blythe, 'Do you intend to marry Alice'? He said, 'No; but I shall make her my legal niece.'" Appellant admitted that Jeffers always called her Miss Dickason or Alice.

Mr. Yberri was a visitor at the house. Appellant testified that he stopped there at one time for a couple of weeks, taking his dinner and lunch there, and she being at the table. But Yberri thought she was Miss Dickason. As late as February, 1883, he wrote to the deceased as follows: "I beg you to give my respects to Miss Dickason. I am very much obliged to her kind-

ness, notwithstanding I have been informed what poor idea she has of my heart."

George S. Irish, who had business connections with the deceased, visited the house a number of times in 1881 and 1882. He knew appellant as Miss Dickason. He took her once to the theater. Appellant admitted going to the theater with him, and testified that, "Mr. Irish thought I was his (Blythe's) niece." In a letter of October 26, 1882, Irish says: "Kindly thank Miss Dickason for writing and tell her," etc.

George Eggleton visited a number of times both at No. 6 O'Farrell and 27 Geary, and took lunch and dinner there. He testified that Blythe introduced him to appellant, saying: "Mr. Eggleton, Alice, my niece."

L. H. Varney was Blythe's business agent at San Francisco, and had been for many years before and down to his death, and was on a social standing with both the parties. He was at the house very often, at least two or three times a week, looking after repairs, supplies, etc. He had the greatest opportunity of knowing the relations existing between Blythe and appellant. He testified that "from 1879 up to the middle of June, 1882, I always knew her as Miss Alice Edith Dickason, and as Mrs. A. P. Vilette in May, 1878. From 1879 up to the middle of June, 1882, I knew her as Miss Dickason; from that time until the death of Mr. Blythe I knew her as Cousin Alice or Miss Dickason; never knew her during that time by any other name." He testified that in May or June, 1882, appellant requested him to take a walk with her; that they went into a store in which rugs, skins, etc., were kept; that she told him Blythe was going to build a house in Mexico in which he wanted such things instead of carpets; and that Mr. Blythe was going to adopt her as his niece. He further testified that a day or two after Blythe's death he saw appellant, when the following occurred: "She came to my room on Market street and said: 'I am Mrs. Blythe.' I said: 'Alice, since when have you been Mrs. Blythe? This is the first time I ever heard you called Mrs.

Blythe.' She said: 'You know how I have been living with Mr. Blythe, and I expect you to help me prove my claim'; and I told her I knew nothing about it."

Jerome Deasy, a private detective, testified that he was employed by Blythe as a bodyguard for three years; that he once asked Blythe why he discharged a certain colored girl, and he said that he was going to have Miss Dickason take charge of the house; and that up to the death of Blythe he knew the appellant as Miss Dickason.

The persons named above are about the only ones who had opportunities of observing the parties closely, and intimately knowing their relations. No person having such opportunities has known the appellant as Mrs. Blythe.

A few more facts and circumstances may be here stated. On January 1, 1883, appellant wrote a note to the witness Varney asking him to call and have a glass of eggnog, and signed it " Cordially yours, A. Dickason." A large number of letters were introduced in evidence written by appellant to Blythe—mostly when he was in Mexico—in which she addressed him as " Dear Uncle," and signed herself " Your Niece" or "Devotedly your Niece." No letter was produced from him to her. She kept an artist's studio on which was always the name Miss Dickason, and went to an art school under that name. She had no calling cards with the name Mrs. Blythe. In 1881 there was issued to her a certificate of mining stock which she indorsed "Alice Dickason." In addition to the occasions above mentioned she was at other times introduced by Blythe as Miss Dickason, my niece, my housekeeper, etc., without protest by her. On the day of Blythe's death the witness McDonald called at the house to offer his services, and saw the appellant. He asked to whom he was speaking, and she replied Alice Dickason. He took out a card to write the name and asked her how to spell it, when she took the card and wrote on it Dickason.

As to Blythe himself, he usually referred to her as

Miss Dickason, my niece, Alice, housekeeper, or cousin. In letters to Andrade and other friends he always referred to her as Miss Dickason. In 1882 and 1883 he wrote numerous letters to his daughter in England, and in them always referred to appellant as "Cousin Alice," and in the daughter's replies she was referred to as "Cousin Alice"; and in appellant's testimony she says that Mr. Blythe read her these letters. Shortly before his death he told the witness Luttrell, who had jested him about getting married, that he was too old; that no one would marry him except for his money; that he had never been married and never would be; and that he had no one but his housekeeper. When he asked the witness Irish to take appellant to the theater, Irish asked him why he did n't go along, and he replied: "O no; I never go out; when Miss Dickason wants to go I usually send Varney with her." On one occasion he exacted of the witness Jeffers the promise that if he (Blythe) should die first, Jeffers would care for his daughter "and be faithful to my friend, Miss Dickason." In the summer of 1881 the witness De Grost had a conversation with him about his mode of living and on the subject of marriage, and Blythe said that "he had met a comely young person, a Miss Dickason, whom he had taken into his service as housekeeper." Upon another occasion in 1882 he said to the same witness that he desired to bring his daughter out from England, "but his domestic arrangements seemed to present a difficulty about bringing out the girl." The witness told him that he thought that "a moneyed consideration— a few thousand dollars—might cause a good-looking young woman to prefer her freedom, and take the chances of marrying a young man, instead of keeping house for an old one. He seemed hurt, and said, impatiently, that he had thought of that, but did not want to terminate those relations abruptly, and an expedient had occurred to him of adopting her as his niece, and he said he had done so."

We think that the foregoing is sufficient to indicate

the general character of the evidence for respondent, although it forms but a part of the great mass of evidence. Counsel for appellant would no doubt consider it a one-sided statement; and, to a great extent, it is so. We are not here weighing conflicting evidence and finding facts. We are merely noticing some of the evidence which supports the finding of the court; and, in view of the evidence already noticed, it is difficult to conceive how any contrary evidence could possibly do more than raise a conflict which would leave the case entirely within the province of the trial court. Appellant, no doubt, produced evidence more or less favorable to her side. She introduced a number of witnesses—mostly tradespeople who had dealt with appellant or delivered packages at the house—who thought she was Mrs. Blythe. But other witnesses of the same character— that is, merchants and mechanics who furnished goods or labor—did *not* think that she was Mrs. Blythe. There was also some testimony of casual acquaintances that on a few occasions Blythe recognized or introduced her as his wife. What credence the court gave to this testimony we do not know, but they were matters about which witnesses might easily have been mistaken; and, at least, when considered in connection with the evidence above noticed, this testimony raised but a slight conflict. Appellant explained why she wrote to Blythe as "uncle" and signed the letters as "niece" by saying that he did not want it to be known in Mexico that he was married. But why did he wish to deny his marriage in Mexico? Of this there is no plausible explanation. It was shown that Blythe, about the time he first became intimate with appellant, had some trouble with a woman named Firman, and this is set up as some excuse for secrecy; but all trouble with her was settled and ended in the fall of 1879. It was shown, also, that in the presence of the gentlemen who visited the house the conduct of appellant was proper and ladylike. Other things favorable to appellant were, no doubt, shown. But the position to be maintained by

appellant is this: that the evidence so overwhelmingly preponderates to the point that appellant and deceased lived and cohabited together *as man and wife,* that there was no substantial conflict on the point, and that the court below abused its discretion in finding otherwise. Such position is utterly untenable.

The transcript contains a number of exceptions to rulings upon the admissibility of evidence and other questions of law; but they have not been much pressed in the argument. It is sufficient to say that we see no errors—if any there are—of sufficient importance to at all affect the decision of the case. Neither do we see any ground for a new trial on the score of newly discovered evidence.

Under the foregoing views we deem it unnecessary to notice the many positions taken by counsel for respondent as to the requisite proof of an unsolemnized marriage; nor to review the many authorities cited by counsel for both sides. Those views lead us clearly to the conclusion that the findings of the superior court should not be disturbed.

The order appealed from is affirmed.

DE HAVEN, J., VAN FLEET, J., GAROUTTE, J., and FITZGERALD, J., concurred.

Chief Justice BEATTY and Justice HARRISON being disqualified did not participate in the decision herein.

Rehearing denied.