[S. F. No. 9919.   In Bank.—December 5, 1921.]

FEDERAL MUTUAL LIABILITY INSURANCE COM-
PANY (a Corporation), Petitioner, v. INDUSTRIAL
ACCIDENT COMMISSION et al., Respondents.

[1] WORKMEN'S COMPENSATION ACT — DEPENDENT MINOR — MERETRI-
CIOUS RELATIONSHIP WITH MOTHER.—Under the Workmen's Com-
pensation Act a minor is entitled to compensation for the death
of an employee as a dependent member of his household in good
faith, although the relations between the mother of the minor and
the employee were meretricious, where they all lived together and
he supported the mother and minor as if they were his own wife
and daughter.

[2] ID.—SUPPORT OF MINOR—LIABILITY OF FATHER—IMMATERIALITY.—
Under the Workmen's Compensation Act the right of a minor to
compensation as a dependent member of the family of an em-
ployee is not affected by the fact that the father of the minor is
legally liable for its support under sections 205 and 206 of the
Civil Code.

PROCEEDING in Certiorari to review an award of the
Industrial Accident Commission.   Award affirmed.

The facts are stated in the opinion of the court.

Cooley, Crowley & Lachmund for Petitioner.

A. E. Graupner for Respondents.

LAWLOR, J.—This is a proceeding in *certiorari* upon a pe-
tition by the Federal Mutual Liability Insurance Company
to review the action of the Industrial Accident Commission
in granting an award to one Bertha Fern Gnash as compen-
sation for the death of one William G. Thompson.

Cassander K. Gnash and George Gnash, parents of Bertha
Fern Gnash, the claimant, were married in Kansas in 1896
and later moved to California.   The record shows that Gnash

1.  Who are dependents within meaning of Workmen's Compensation
Act, notes, Ann. Cas. 1913E, 480; Ann. Cas. 1918B, 479; 13 A. L. R.
686; L. R. A. 1916A, 121, 163, 248; L. R. A. 1917D, 157; L. R. A.
1918F, 483.

"Child" in statute relating to workmen's compensation as includ-
ing illegitimate child, note, Ann. Cas. 1918B, 258.

was a poor provider and that the members of his family were compelled to support themselves to a large extent. He was in the habit of going away and leaving them for weeks at a time, and finally left them permanently. After that Mrs. Gnash supported herself by various kinds of work until October, 1917, when she went to Yermo to do housework and cooking for the deceased, William G. Thompson, on his ranch. She took Bertha Gnash, then six years old, with her. Later the three moved to a mine near Baxter, and at about that time, according to the testimony, the relationship between Thompson and Mrs. Gnash changed. He stopped giving her wages and began paying the expenses of herself and Bertha. Mrs. Gnash continued to do the housework and cooking. In May, 1918, Mrs. Gnash, with Thompson's coöperation, started proceedings to secure a divorce from Gnash, which suit was never determined. From that time Thompson and Mrs. Gnash lived together openly as husband and wife. Mrs. Gnash used the name "Mrs. Thompson" and Bertha was called "Bertha Thompson." Thompson supported them entirely, giving the money to Mrs. Gnash, who bought what she wanted for Bertha. In February, 1920, they were living in Redlands, and Thompson was working for one W. C. Crowell as a carpenter. On February 19, 1920, he fell off a scaffold, sustaining injuries from which he died. Mrs. Gnash petitioned for compensation under the Workmen's Compensation, Insurance and Safety Act. It was stipulated that the injuries which caused Thompson's death arose out of and in the course of, his employment; that his average earnings were $4.50 per day; that he was working six days per week; that any benefits to be awarded should be computed upon that basis, and that W. C. Crowell, the employer, was insured against risks under the Compensation Act by the petitioner, Federal Mutual Liability Insurance Company.

Upon the hearing Mrs. Gnash testified she was Thompson's wife and that Gnash was dead. She gave the date of her marriage to Thompson as November 28, 1917, and described a judge who she said performed the ceremony. After the hearing she confessed to the referee that her relationship with Thompson was meretricious. The referee, in an affidavit signed by himself, forwarded the information to the Industrial Accident Commission, and Mrs. Gnash abandoned

all claim against petitioner on her own behalf. Bertha Gnash was awarded compensation in the sum of $4,889.98, the commission finding that she was "a member of his [Thompson's] family in good faith and wholly supported by him." A rehearing was had upon application of the petitioner. At the rehearing Mrs. Gnash testified that she had not been married to Thompson, and described the relationship as she had confessed it to the referee to have been. The Industrial Accident Commission affirmed its former finding that Bertha Gnash was a member of decedent's family and entitled to compensation. The award was affirmed, except that it was reduced to $4,001.40, the correct sum when computed at the stipulated rate of $4.50 per day. Petitioner thereupon brought this proceeding.

1. In support of the contention that the award should be annulled, petitioner advances two arguments. The first of these is that "Mrs. Gnash was an employee of Thompson in domestic service, and, therefore, neither she nor Bertha Fern Gnash was a member of his 'family or household' within the meaning of the Compensation Act. . . . Mrs. Gnash went to work as a cook and that fact being established, and no criminal or unlawful act being proved, it is presumed that this relationship of employer and employee continued between Thompson and Mrs. Gnash until his death." It is insisted that the record refutes any claim that the relation of employer and employee was terminated; that Mrs. Gnash testified she went to the mine to work for Thompson as a cook; that Mrs. Gnash's married daughter, Mrs. Grace Hart, testified that Mrs. Gnash did Thompson's work for him and in return she received her support and Bertha Gnash's; that the change in method of payment, or the fact of cohabitation between Thompson and Mrs. Gnash, did not alter the relation of employer and employee. Respondents assert that "the facts of the case, however, show that there came a time in the relationship between the employee [Thompson] and Mrs. Gnash when she ceased to be his employee and he ceased to be her employer, and when they began to cohabit. When the period of cohabitation began, wages ceased, and the employee commenced to support Mrs Gnash and her child as members of his household and on a distinctly different relationship from that which existed at the time that Mrs. Gnash first went to the employee. . . . After they reached the mine,

a different relationship commenced. There they began to cohabit, and the employee paid the expenses for the woman and the child apparently without regard to the amount thereof. . . . In spite of the contentions of petitioner, the record distinctly shows beyond all doubt that Thompson and Mrs. Gnash lived together as man and wife, and that he supported Mrs. Gnash and her child as he would his own wife and daughter.''

In our opinion the evidence sustains respondent's contention and the implied findings of the Industrial Accident Commission that at the time of decedent's death his relations with Mrs. Gnash were not those of an employer. It is true that Mrs. Gnash testified she went to the mine as a cook, and that her daughter testified Mrs. Gnash received her support from Thompson in return for her services. However, we think the evidence shows there was more of a change in their relationship than might be implied from the fact that Thompson stopped paying Mrs. Gnash wages, or, indeed, from the fact of the meretricious relationship. Mrs. Gnash testified: ''No, he never paid me wages after I went to the mining camp. Q. Out on the desert? A. Yes. Q. Did he pay the expenses? A. He paid the expenses. Q. To whom? A. To myself and my little girl. . . . Q. When did you first become known and call yourself Thompson? A. After we visited the lawyer's office to file the divorce suit. . . . Q. You never were married to Mr. Thompson? A. No. Q. Was he agreeable to having you use his name, Thompson? A. He asked me to on account of gossiping tongues. Q. What did Bertha call him—how did she address him? [And addressing the child she asked:] A. Daddy, didn't you? Bertha Fern Gnash: [Nods head affirmatively.] . . . Q. Where was Guy Gnash living during 1919 and the first part of 1920? A. With Mr. Thompson and I. Q. Wherever you were? A. We were in Elsinore. Q. In Elsinore and Redlands? A. Yes. He was living with you as one of the family? A. Yes. . . . No, it was after he was married, he and his wife lived here with us, on 115 Church, for a little while. . . . Q. Was he living at home? A. Yes. Q. With you? A. Yes. Q. Did you charge him board and lodging? A. Yes, surely, he paid his way.'' Mrs. Gnash stated that her son did not contribute to her support or Bertha Gnash's ''after Mr. Thompson started keeping us, supporting us, be-

cause it was not necessary.'' She further testified: "Q. Did you and Mr. Thompson have any plans, any expectations of getting married? A. We surely did. Q. Had you discussed that with him? A. Yes. Q. And what did you intend to do? A. We intended to get married as soon as Mr. Maloney, after the suit was filed, but we just neglected sending in the rest of the money; in fact, we bought some property which tied us up.'' Guy Gnash, Mrs. Gnash's adult son, testified he met Thompson in 1917 on a train. "Q. Was your mother then living with him? A. No, sir. Q. Was she working for him? A. Yes, I believe she was working for him. Yes, she was working for him. . . . Q. Was that the time [when they were at Afton] when your mother began living with Mr. Thompson? A. No. I don't think so. Q. When did she begin living with him? A. I think that's when they went to Elsinore. Q. She was working for him in Afton? A. She was working for him in Afton.'' It thus appears that in the latter part of their association Thompson paid all the expenses and supported Mrs. Gnash and Bertha Gnash; that it was at his request that they assumed his name; that he was assisting Mrs. Gnash to secure a divorce; that he intended to marry her when the divorce was obtained; that they bought property together; that Mrs. Gnash's son lived "at home" with them as "one of the family,'' and that the difference in the relationship between them while Mrs. Gnash was "working for'' Thompson and while she was "living with him'' was clearly recognized by Mrs. Gnash's son. It is idle to assume that when he spoke of his mother as "living with'' Thompson he meant anything else than what the words import. In our opinion these facts show that at the time of Thompson's death Mrs. Gnash was a member of his household and supported as such, and that the money Thompson gave her was not paid as wages to an employee, but was given to Mrs. Gnash for herself and Bertha Gnash as if spent by the head of a family for those in the household.

*Moore Shipbuilding Corp.* v. *Industrial Acc. Com.*, 185 Cal. 200, [13 A. L. R. 676, 196 Pac. 257], was a case in which the facts were similar to those in the case at bar. There a woman was living with an employee who was killed, and with them lived the claimant, the woman's young daughter. In that case the court said: "Again, the word 'household'

is variously used to designate people, generally, who live together in the same house, including the family, servants, and boarders; or it may be used as including only members of the family relation. It is *probable that the two terms are coupled together in this statute to indicate that they are used synonymously, the 'family' to include only those of the household who are thus intimately associated, the 'household' to exclude those of the family not living in the home. There can be no doubt that Bauer, Mrs. Miller, and the little girl constituted a family or household. They were living together in all the interdependency of man and wife and their legitimate offspring. The only thing to exclude Mrs. Miller from the benefit of this relation was lack of good faith.''* [1] We think the facts of the case at bar, as already brought out, show that the three people were living together as a family and were members of one household, it being held in *Moore Shipbuilding Corp.* v. *Industrial Acc. Com., supra,* that people living together in such a relationship may constitute a household.

2. Petitioner's next contention is that Bertha Fern Gnash, being a legal dependent of her father, George Gnash, could not legally be a total dependent of the deceased, Will Thompson. This claim is based upon the fact that sections 205 and 206 of the Civil Code make a father legally liable for the support of a minor child, and that section 14, subdivision *a,* of the Compensation Act, raises a conclusive presumption that a child under the age of eighteen is wholly dependent "upon the parent with whom he or they are living at the time of the death of such parent or for whose maintenance such parent was legally liable at the time of death.''

Even if George Gnash is legally liable for the support of Bertha Gnash, we are not prepared to hold that this precludes her from becoming wholly a dependent on Thompson within the meaning of the Compensation Act. Section 14 of that act (Stats. 1919, pp. 910, 917), provides that "(a) The following shall be conclusively presumed to be wholly dependent for support upon a deceased employee: . . . (1) A wife upon a husband with whom she was living at the time of his injury, or for whose support such husband was legally liable at the time of his injury. (2) A child or children under the age of eighteen years, or over said age, but physically or mentally incapacitated from earning, upon the parent

with whom he or they are living at the time of the injury of such parent or for whose maintenance such parent was legally liable at the time of injury, there being no surviving dependent parent.

"(b) In all other cases, questions of entire or partial dependency and questions as to who constitute dependents and the extent of their dependency shall be determined in accordance with the fact, as the fact may be at the time of the injury of the employee.

"(c) No person shall be considered a dependent of any deceased employee unless in good faith a member of the family or household of such employee, . . . ''

It will be noted that subdivision *a* does not provide generally, as contended by petitioner, that a child is conclusively presumed to be dependent on the parent who is legally liable for his support. That subdivision provides that when a child's parent is killed and no dependent parent survives, the child is presumed to have been dependent on the deceased parent. That situation is not presented here, for, even if it had been Bertha Gnash's father who was killed, still she has a dependent parent surviving—Mrs. Gnash (Civ. Code, secs. 155, 174, 175)—who admittedly has no claim under the Compensation Act because of Thompson's death. The case, therefore, falls within subdivision *b*, which provides that in all other cases dependency shall be determined in accordance with the fact as it may exist at the time of the injury.

In *Moore Shipbuilding Corp.* v. *Industrial Acc. Com.,* *supra,* there was a finding that Mrs. Miller's husband, the claimant's father, was dead. An examination of the record shows that this finding was made in the first hearing of the cause, in spite of the testimony of Mrs. Miller to the effect that at the time she was living with Bauer she knew she was then the wife of another man. Upon the rehearing, however, which was a hearing *de novo,* there was no such finding. In that case the effect of Miller's legal liability for the claimant's support was not discussed. However, the fact that Bauer was not legally liable for her support was considered and the court said: "The need of relief from the deprivation caused by the death of the employee and the questions of public policy involved rest upon the fact that the employee has in good faith taken into his home and

assumed the support of one without other means of subsistence. The hardship to the individual dependent and the incidental burden to the insurer or to society from the death of a bread-winner are no different whether the maintenance of the dependent has been voluntarily and gratuitously assumed, or legally imposed.

"As has been pointed out, the benefits of this law are not provided as an indemnity for negligent acts committed or as compensation for legal damages sustained, but is an economic insurance measure to prevent a sudden break in the contribution of the worker to society, by his accidental death in the course of his employment. From this economic standpoint it makes no difference whether the workman's earnings are being distributed to those whose support he has voluntarily assumed, or to those who are legally entitled to such support. In either case they are the reliance of dependent members of society. The only difficulty is that where there is no legal dependence it is harder to determine that the contribution of support has been made so as to constitute the recipient a dependent in good faith. . . .

"There are three vital conditions required to establish dependency in this case under the Compensation Act. First, was Ida Miller actually dependent upon the decedent for her support; second, was she a member of his family or household; third, was the relation or connection sustained in good faith?"

[2] It is clear both from the wording of the act and from that case that the benefit of the statute does not depend upon legal liability for support. As pointed out, there is no presumption that because Gnash was legally liable for Bertha Gnash's support, she was wholly dependent upon him, within the meaning of the Compensation Act, and if she were in fact a dependent of Thompson, the effect of Thompson's death upon her is the same whether she has a father who is legally liable for her support or not. If she was in fact a dependent of Thompson, and was in good faith a member of his household, she is entitled to compensation, whether or not her father was alive.

It was found by the Industrial Accident Commission that "applicant Bertha Fern Gnash was at the time of the death of the employee, in good faith a member of his household and was totally dependent upon him for support at said time

within the terms of the Workmen's Compensation, Insurance and Safety Act of 1917.'' As we have shown, Mrs. Gnash was not an employee of Thompson at the time of his death, and the money paid for Bertha Gnash's support was not paid to Mrs. Gnash as wages. Concerning Bertha's position in Thompson's household, Mrs. Gnash testified:·''Q. Have they [Mrs. Hart and her husband] made any gifts of money, clothes or anything else to Bertha? A. Some clothes for Bertha since Mr. Thompson was killed. Q. Before Mr. Thompson was killed? A. No, not before; Mr. Thompson supported her. . . . Q. Did Mr. Thompson display any special affection for Bertha? A. Well, no, nothing more than a father, of course; he showed her more fatherly love than her own did, a whole lot, or ever did, as far as supporting her. . . . Q. Where did you get the money and the funds that you used to buy the clothing for Bertha and yourself since you were living with Mr. Thompson? A. From Mr. Thompson. Q. Did he understand that his money was being used to support Bertha that way? A. Yes. Q. To buy her clothing? A. Most assuredly. Q. Did he ever buy any school books? A. No, because books were furnished; he did not have to buy school books.'' Bertha Gnash testified: ''Q. Do you know where you got your dresses and clothes that you wore; where did they come from? A. My father, Mr. Thompson. Q. What did you call Mr. Thompson? A. ˙Father. Q. What is your name? A. Bertha Fern Thompson. Q. Was Mr. Thompson good to you? A. Yes.'' Mrs. Grace Hart testified: ''Q. Do you know whether or not she [Bertha Gnash] has recognized Mr. Thompson, the deceased, as her father? A. Yes. Q. Did she look upon him as her father? A. She did. Q. Do you know whether she ever knew the difference? A. She never. . . . Q. Do you happen to know whether Mr. Gnash contributed anything to your mother for her support or for the support of Bertha since he has been away? A. No. Q. He has not? A. He has not.'' Guy Gnash testified further: ''Q. Did you have occasion to observe how Mr. Thompson provided for your mother? A. He provided well for her. Q. Who else lived with them? A. Bertha Fern. Q. Did he provide for her? A. He did. Q. Did she consider him her father, did she treat him as though she thought he was her father? A. Yes, she did. Q. What did she call him, what was her

term? A. Sometimes she called him 'Dad.' . . . Q. You knew that your sister Bertha was called Bertha Fern Thompson? A. Yes.''

This evidence shows clearly that Thompson treated Bertha as if she were his own child and that he provided for her as a father might. It is ample to support the finding of the Industrial Accident Commission that Bertha Fern Gnash was wholly dependent on Thompson and was a member of his household. There can be no question but that she regarded him as a father and that she was in good faith a member of his household.

Petitioner has cited *Farrington* v. *Lachman & Jacobi,* 1 I. A. C. of Cal. (Pt. I) 116, a case wherein a father, whose children were being cared for by another, was killed, and the children were allowed compensation. It appears the mother of the children had died before the father. There being no surviving dependent parent, the case fell squarely within subdivision *a* of section 14 of the Compensation Act, and the children were to be conclusively presumed wholly dependent upon the father. *Wilcut* v. *Cudahy Packing Co.,* 4 I. A. C. of Cal. 308, a case of a deserted wife, also came within subdivision *a* of section 14, and in *Aldinger* v. *Ransome Concrete Co.,* 1 I. A. C. of Cal. (Pt. I) 151, the commission found the applicant's mother to have been, as a fact, an employee of the deceased, with whom she was living, and that the mother and not the deceased supported the child. In the case at bar the claimant's mother was not an employee of the decedent, but, as we have pointed out, was a member of his household.

The award is affirmed.

Sloane, J., Shurtleff, J., Wilbur, J., Lennon, J., and Waste, J., concurred.

SHAW, C. J.—Dissenting. I dissent.

I do not believe that persons living together in the relation shown in this case can justly or properly be considered as constituting a lawful family or household within the meaning of the Workmen's Compensation, Insurance and Safety Act. This court has heretofore decided that such persons may be a lawful household, but I did not concur therein. On such a question of ordinary morality I cannot defer to or follow that decision.