ELLIOTT, Respondent, *v.* INDUSTRIAL ACCIDENT BOARD, Appellant.

(No. 7,503.)

(Submitted January 9, 1936. Decided January 16, 1936.)

[53 Pac. (2d) 451.]

*Mr. Raymond T. Nagle,* Attorney General, *Mr. C. J. Dousman,* Assistant Attorney General, and *Mr. Henry McClernan,* Special Assistant Attorney General, for Appellant, submitted a brief; *Mr. McClernan* argued the cause orally.

*Mr. Chris W. Demel, Mr. Philip Savaresy* and *Mr. Guy C. Derry,* for Respondent, submitted a brief; *Mr. Derry* argued the cause orally.

MR. JUSTICE MATTHEWS delivered the opinion of the court.

Edward E. Elliott, while employed by the Santa Rita Pipe Line Company at Cut Bank, Montana, under the name of Thye Kelly, was accidentally killed in the course of his employment. Adell Elliott filed with the Industrial Accident Board her claim for compensation as the widow of the deceased. After hearing had, at which considerable testimony was taken, the board, on December 11, 1933, made findings of fact and conclusions of law on which it rendered its order and decision denying the claim on the ground that the claimant was not the wife of deceased at the time of his death. Both the claimant and the employer moved for a rehearing, the motions were granted and additional testimony was taken, and on December 1, 1934, the board affirmed and adopted its former findings, made additional findings, and again rendered decision against the claimant. The claimant then appealed to the district court of Glacier county, where the matter was reviewed upon the record of the board alone. The court reversed the decision of the board and awarded the claimant compensation. The board has appealed from the judgment upon the sole specification that the court erred in reversing the order and decision of the board.

The proceeding in the district court was one of review, and the reversal can be justified only if the evidence in the record preponderates against the conclusions of law and the decision of the board. (*Willis* v. *Pilot Butte Min. Co.*, 58 Mont. 26, 190 Pac. 124; *Dosen* v. *East Butte Copper Min. Co.*, 78 Mont. 579, 254 Pac. 880; *Williams* v. *Brownfield-Canty Co.*, 95 Mont. 364, 26 Pac. (2d) 980; *Woin* v. *Anaconda Copper Min. Co.*, 99 Mont. 163, 43 Pac. (2d) 663.)

The record presents a rather bewildering tangle with relation to the matrimonial career of Edward E. Elliott. Between the time of the first hearing and the rehearing, Charlotte Wolf Elliott filed a claim for compensation as the widow of deceased; her showing by affidavit and submission of a marriage license

is that she married "Edward E. Elliott," then a brakeman on a railroad running into Little River, Kansas, in June, 1920, divorced him in 1926, and remarried him, under a license showing his residence as "Amarillo, Texas," on March 28, 1927. She then states that "a little later Mr. Elliott secured a considerable sum of money from me and left for Amarillo, Texas"; how long after the 1st of April, 1927, this couple lived together is not stated.

In support of her claim for compensation, Adell Elliott testified that she met the deceased, Edward Everett Elliott, at "Amarillo, Texas," on Memorial Day, 1926, and on March 5, 1927, they married at Amarillo, Texas. During the time she knew Elliott in Texas he was yardmaster for the Fort Worth & Denver Railroad. In April, 1927, Edward and Adell Elliott came to Billings, and there lived together as man and wife until April 29, 1931, when Mrs. Elliott secured a decree of divorce. About this time Elliott went to jail to serve a 30-day sentence for violation of the liquor laws, with, apparently, 90 days' additional sentence which was temporarily suspended. From his release up to the time he returned to jail to serve the 90-day sentence, Elliott lived with one Dorothy Reick; they living together as man and wife to all outward appearances. Miss Reick visited Elliott in jail, and he then told her that, on his release, he was going to Casper, Wyoming, and asked her to go with him; he secured a license to marry her, evidently without consulting her; it was never used.

Adell Elliott's claim for compensation is based upon the following showing made before the board: Mrs. Elliott testified that she never ceased to care for her husband, but that he had been gambling and drinking to excess and she divorced him to straighten him up; that she never felt that she was divorced from him while in jail. She testified that they had a conversation shortly before his release in which she told him that she would marry him again if "he would quit drinking and improve his conduct"; they agreed to remarry, leave Billings, and go somewhere else for a fresh start. She had made

arrangements with a traveling man for them to go with him in his car to Casper, paying $5.50 as their share of the cost of transportation. On leaving the jail, and before starting for Casper, according to her story, she said, "Ed, where are we going to get married?" to which he replied, "Dell, it costs $2 for a marriage license and $5 for a justice of the peace to marry us, and I have not got a cent and you have very little. If we agree to get married and if we agree that we are married and go ahead and live together as man and wife, it will be a common-law marriage, * * * it will be just as good." They thereupon so agreed, took the trip to Casper and later went to Cut Bank, where they lived under an assumed name, but at all times lived together and held each other out to their neighbors as man and wife.

More than twenty witnesses testified either orally or by affidavit that the parties conducted themselves at all times as a regularly married couple; Edward supported her; she incurred bills at stores, which he paid; they occupied a single room and bed; and so lived and conducted themselves from the time of their agreement in April, 1932, up to the time of the fatal accident on September 4, 1933. Mrs. Elliott was with Elliott at the time of his death, took charge of the body, and took it to Billings for burial.

Adell Elliott was corroborated with respect to her claim to the following extent: The deputy sheriff in charge of the jail where Elliott was confined the second time made affidavit that he had many conversations with Elliott, who expressed "a great deal of affection" for his wife, from whom he stated he was divorced, but said they "were going to get married again"; that he understood they were to remarry as soon as Elliott's sentence was completed, and that "Mrs. Adell Elliott came to jail to get Elliott when he was released."

The board took a peculiar view of the law applicable to the facts; it, apparently, gave full credit to the claimant's proof respecting her contention that she and the deceased entered into a common-law marriage on his release from jail. Before

any evidence was adduced with respect to Elliott's relations with Dorothy Reick, in its decision of December, 1933, the board expressed its views as follows: "The brief submitted by claimant cites numerous authorities on the question of 'what constitutes marriage.' In none of the cases cited is a situation such as is disclosed in this case. All of the cases assume a continuing relationship where the parties hold themselves out *continuously* as man and wife throughout the entire period of their living together. We think the board must take into consideration, not the situation of Adell Elliott and Edward Elliott after their divorce in 1931 alone, but their situation during their entire period of living together, that is, from 1927 until the day of Elliott's death." The board then comments on the fact that the claimant secured a divorce on the ground of "cruel and inhuman treatment," and on the hearing denied that he was guilty of such treatment, and states that there is no reason why the board should take the later sworn statement, rather than the former, as true. It then declares that the parties were divorced legally and their marital relation ended; that, under the authorities, living together "*continuously,* holding themselves out as man and wife, the presumption arises that a legal marriage exists," but that "the divorce, * * * a matter of public record, * * * known generally in the community in which they lived, * * * destroys any *presumption* of marriage." Continuing, the board concludes that it "has no right to follow the claimant's reasoning that their relationship after their divorce should be considered only, but we must consider the relationship * * * from the date of their legal marriage until his death to determine whether, at the time of his death, he was the husband of Adell Elliott; to pick a date outlined by claimant at any time that suits her purpose to inquire into the relationship * * * is ridiculous."

The only additions to the findings made on the first hearing, as a result of the rehearing, are: "The conclusions reached by the board in its decision and order on December 11, 1933, are strengthened materially by the evidence produced at the re-

hearing, that Edward Elliott and Dorothy Reick lived as Mr. and Mrs. Elliott * * * in the city of Billings between April, 1931, and January, 1932. Elliott lived with Dorothy Reick and held her out as Mrs. Elliott to the neighbors, friends and storekeepers, in the same community, as he did with Adell Elliott, whom he held out as his common-law wife.'' It will be noted that the board does not find that Elliott and Dorothy Reick ever agreed to become man and wife. It will also be noted that Edward and Adell Elliott did not live as man and wife in Billings, after their reunion, although they did for a time visit with her sister and husband four miles from Billings.

By carefully outlining its conclusions reached as the basis for its decision, the board greatly simplified the question presented to the district court for review and to this court on appeal. That question is simply, according full faith and credit to all the findings of fact made by the board: Do those findings, as a matter of law, warrant the conclusions reached and justify the decision of the board?

One of the disputable presumptions in this state is ''that a ▇ man and a woman deporting themselves as husband and wife have entered into a lawful contract of marriage.'' (Subd. 30, sec. 10606, Rev. Codes 1921.)

The so-called ''common-law marriage'' is recognized as valid ▇ in this state, but, to be effective there must be the mutual consent of parties able to consent and competent to enter into a ceremonial marriage, and the assumption of such relationship, by consent and agreement, as of a time certain, followed by cohabitation and repute. The continuity of the relationship, mentioned and italicized by the board, has reference to the period beginning with the assumption of the marital relations by consent to become man and wife. (*In re Huston's Estate,* 48 Mont. 524, 139 Pac. 458; *Welsh* v. *All Persons,* 78 Mont. 370, 254 Pac. 179; *Shepherd & Pierson Co.* v. *Baker,* 81 Mont. 185, 262 Pac. 887.)

The initiation of the relations by consent and the continuity thereof in the instant case were fully established by the evi-

dence and recognized in the findings of the board, but the board fell into error in construing the law to require continuity from ██ ██ the date of the original ceremonial marriage. There is no legal reason why a divorced man should not enter into a common-law marriage with the spouse who divorced him, as well as with another woman. Indeed, it would seem more probable that such a couple should waive the conventions, particularly where, as here, the woman secured a divorce on trumped-up charges for the purpose of reforming her spouse and never "felt" that she was divorced, than that a woman who had never been married, and particularly never married to the particular man, would do so.

Counsel for appellant contend that the claimant's testimony with reference to the agreement to enter into a common-law marriage is incredible, as neither party had any legal training. In the light of the deceased's marital experience, we do not find this testimony unbelievable, but, if so, the evidence is sufficient to establish a common-law marriage, even though the parties had no knowledge of what constitutes such a marriage.

As to the capacity of the parties to marry at the designated time, the presumption of marriage mentioned above must be repelled by the party disputing it, and this can be done only by satisfactory evidence. (*In re Huston's Estate,* supra.) The record contains but three suggestions of incompetency: First, a letter written to the employer, signed "Gilbertson," dated September 11, 1933, and written from Billings, stating that Adell Elliott divorced Elliott there and married "another man." There is no suggestion in the evidence adduced that such was the fact. Second, with reference to the claim of Charlotte Wolf Elliott, the board properly held that her marriage to Elliott was invalid by reason of his prior ceremonial marriage to this claimant. Third, while a common-law marriage would have existed under the proof respecting the cohabitation of Elliott with Dorothy Reick, the evidence was rendered harmless by the woman's own testimony, in answer to the question in form of a declaration, and after she had testified that she and Elliott had

lived together and held themselves out in the community as man and wife: "Q. You did not consider that you were his wife? A. I did not want to be." On the record, therefore, the parties were capable of entering into the marriage relation.

It is therefore conclusively shown that, on the question of law presented to the district court, the court ruled correctly, and its judgment must be affirmed.

MR. CHIEF JUSTICE SANDS and ASSOCIATE JUSTICES STEWART, ANDERSON and MORRIS concur.