J. H. MILLER, Plaintiff and Respondent, v. EVA E. SUTH-ERLAND, Defendant and Appellant.

No. 9558.

Submitted February 28, 1957. Decided April 3, 1957.

309 Pac. (2d) 322.

176

Mr. Jess L. Angstman, Messrs. Morrison & Ettien, Havre, for appellant.

Messrs. DeKalb, Dockery & Symmes, Lewistown, for respondent.

Mr. Angstman, Mr. J. Chan Ettien, Mr. Weymouth D. Symmes and Mr. H. Leonard DeKalb argued orally.

MR. CHIEF JUSTICE HARRISON:

Respondent brought this action to quiet title to certain de-

scribed real property. By answer appellant denied the allegations of the complaint except that respondent was the owner and in possession of the real estate, and alleged that appellant asserted an inchoate right of dower in the real property because she was the wife of the respondent. In addition, the answer sets up a cross-complaint containing two causes of action; first that the appellant was the common-law wife of the respondent; and second that respondent and appellant had entered into an agreement by the terms of which each agreed to devise and bequeath to the other one-third of all the property owned by them through the execution of mutual wills.

Trial was had before the court which entered judgment and decree quieting the respondent's title in the lands and dismissing the two causes of action pleaded in the cross-complaint on the merits. Appellant appealed from this judgment and contends that the court erred in finding and decreeing that appellant was not the wife of the respondent.

Appellant and respondent became acquainted in 1928, and respondent commenced an active courtship. During the month of June, 1932, appellant returned to Montana from California and arrived at Livingston. There she called the respondent at his ranch near Windham, Montana, by phone and told him she would be his. Arrangements were made to meet at Billings, Montana, in the same conversation. Appellant testified that in the Northern Pacific Depot at Billings, Montana, she had laid down to rest on a couch, fell asleep, and that she was awakened by the respondent who leaned down and kissed her. A conversation then followed in which the appellant and respondent orally agreed to be man and wife. This alleged oral agreement was denied by the respondent. The parties then went to Gage Hotel in Billings, registered as man and wife and that night, according to the appellant's testimony, the marriage was consummated. At this time respondent was sixty years of age, appellant thirty-two.

Following this, the parties went to the respondent's ranch where during that summer they occupied separate bedrooms.

While respondent's son and daughter were on the ranch during that summer appellant did not represent to them that she was respondent's wife. That fall appellant applied for and received a position as teacher in the Tonnetti School under the name of Eva E. Sutherland. She represented herself as a single woman to the students, parents, school board and county superintendent. Appellant in succeeding years followed employment as a school-teacher in various schools in Montana and at Baker, Oregon, and in every instance represented herself as a single woman. Appellant asserted that by an agreement with the respondent she was to keep her maiden name in all her business dealings, and also that during the years immediately following her purported marriage it was difficult for a married teacher to get a position. During the summer vacation periods she returned to the ranch.

The respondent, as soon as his fall work was completed, would go to a community in the vicinity of where appellant was teaching and secure a tourist cabin, motel, or other living quarters, and appellant would visit with him over the week-ends, usually from Friday evening to either Sunday night or Monday morning.

There is no question but during all the years up until July 21, 1949, the respondent was greatly enamored with the appellant, and as he testified he would have married her at any time during that period, but the appellant always refused, stating it was against her religious scruples to marry when her divorced husband was still alive.

In registering at hotels, tourist camps or other living quarters while away from the ranch, appellant and respondent stated they were husband and wife. On such occasions they did not visit much with other people. At Cut Bank, Montana, and at Baker, Oregon, appellant represented the respondent as her father. Respondent wrote many letters to the appellant in which he referred to her as his wife, but which letters were always addressed to her as ''Eva E. Sutherland.'' He testified this was merely a way of showing his love for her.

Numerous greeting cards carrying ''to my wife'' or similar

designations in print, and some to the same effect in writing, were received in evidence. These were admittedly sent by respondent to appellant over the years here involved, and in all cases they were addressed to Eva R. Sutherland.

A will purportedly executed by respondent dated January 7, 1936, refers to appellant in this language: "* * * and to the person known as Eva Sutherland * * * and I further state that Carl, Vivian and Helen [being the children of respondent] shall show every consideration, to be kind and just to my Eva, known to you as Eva Sutherland, for I love her dearly."

In 1942, the parties executed mutual wills in which they referred to each other as husband and wife. The respondent testified that he did not authorize such a designation and that he did not read the will after its preparation.

Letters written by appellant in 1947 and 1948 to respondent read "Dear Pal" or "Dear." Nowhere in any letter introduced does appellant refer to respondent as her husband.

A policy of insurance on the life of appellant, issued September 23, 1944, wherein her name is carried as Eva E. Sutherland, states that she is a divorced woman.

Appellant's voting registration card, executed on May 23, 1944, was signed Eva E. Sutherland, but she had it changed by adding the name Miller after the primary in 1952.

Appellant considered Windham, Montana, as her home, and she testified that at no time while living there in the summers of 1932 to 1944 had she ever introduced Mr. Miller as her husband to any friend of hers who came to the ranch. She further testified that she did not recall ever, prior to 1948, introducing Mr. Miller as her husband to any friend of hers.

Appellant testified the purported marriage was concealed part of the time. The part of the time it was not concealed was when, as she termed it, they were living their normal lives as man and wife in cabins, and she was not in the business world.

Turning to the testimony of witnesses from the locality of Windham, we find the postmaster testifying that to his knowl-

edge appellant never, during all this period of time prior to 1949, received any mail addressed to her as Eva Miller.

A neighbor testified that during all this period of time appellant never went by the name of Eva Miller.

An employee on the ranch in the years of 1931 and 1935 testified that he saw appellant on the ranch. He stated she occupied a separate bedroom, was introduced as Miss Eva Sutherland, and she never represented herself as Mrs. Miller. While he further testified that the appellant and respondent acted like a married couple, he admitted their conduct in 1935 was no different than it had been in 1931 when appellant was likewise on the ranch, and which admittedly was before the purported marriage took place.

A long-time friend of the respondent testified that he visited the ranch in the middle thirties with his wife and family, and appellant was not known to him as Eva Miller, and that she never told him she and respondent were married, nor did they ever refer to themselves as husband and wife. He presumed they were married.

Another neighbor testified that he was acquainted with both parties, and that neither of them had ever represented to him that they were man and wife.

An employee on the ranch off and on for about twelve years testified they slept in separate bedrooms, and that he never addressed appellant as Eva Miller, but had addressed her as Eva and as Miss Sutherland.

Another employee who went to work on the ranch in 1945 testified that at the time of her employment, respondent introduced her to appellant as "her boss," but never introduced her as Mrs. Miller. She testified they occupied the same bedroom, and it was her impression that they were a married couple.

Another employee testified that when they first came to the ranch they occupied the same bedroom for a few nights and after that they had separate rooms. She testified that appellant told her that she had never married respondent because it was against her religion to do so as long as her first husband was

alive. She presumed they were married. She stated she always called appellant Mrs. Miller, but the appellant told her not to call her Mrs. Miller but to call her Eva. On cross-examination she admitted when first employed the respondent told her that he was a widower.

Another witness who had lived in the Windham community since 1915 stated she had from time to time visited with the appellant and that she knew her as Miss Sutherland. On one occasion appellant had told her she was married, but this was since 1949, after the break-up between appellant and respondent.

It appeared from the record that on or about the 21st day of July, 1949, the appellant and respondent had a discussion with regard to respondent conveying to appellant certain land, which appellant insisted that respondent should do, and which the respondent refused to do. This resulted in a break-up of the relations which had continued over a period of seventeen years. The parties thereafter went their separate ways.

Our statute with regard to marriage is R.C.M. 1947, section 48-101, which provides:

"Marriage is a personal relation arising out of a civil contract, to which the consent of parties capable of making it is necessary. Consent alone will not constitute marriage; it must be followed by a solemnization, or by mutual and public assumption of the marital relation."

R.C.M. 1947, section 48-103, provides: "Consent to and subsequent consummation of marriage may be manifested in any form, and may be proved under the same general rules of evidence as facts in other cases."

In construing our statutes this court in Welch v. All Persons, 85 Mont. 114, 133, 278 Pac. 110, 115, stated:

"Marriage is defined by our statute as a 'personal relation arising out of a civil contract, to which the consent of parties capable of making it is necessary'. Section 5695, R.C. 1921 [section 48-101, supra]. This terse definition embraces the essential elements recognized by the authorities generally. See 38 C.J. 1272 et seq.; 18 R.C.L. 381 et seq.

"The consent of the parties must be mutual. Shepherd & Pierson Co. v. Baker, 81 Mont. 185, 262 Pac. 887. While the consent need not be expressed in any particular form (section 5697, R.C. 1921 [sec. 48-103, supra], as we said in State v. Newman, 66 Mont. 180, 213 Pac. 805, it must always be given with such an intent on the part of each of the parties that marriage cannot be said to steal upon them unawares. 'One cannot become married unwittingly or accidentally. The consent required by our statutes, as well as the statutes of every state, and by the common law, must be seriously given with the deliberate intention that marriage result presently therefrom.' 'There must be an agreement between the parties that they will hold toward each other the relation of husband and wife, with all the responsibilities and duties which the law attaches to such relation, otherwise there can be no lawful marriage'. Williams v. Williams, supra [46 Wis. 464, 1 N.W. 98, 32 Am. Rep. 722]. The absence of such consent renders the relations of the parties meretricious. 38 C.J. 1316."

Respondent's testimony in this case indicates that while he was ever pressing his suit to the appellant and desired to marry her, and this for a period of seventeen years, she at all times refused on the grounds that her religious scruples would not permit a marriage while her divorced husband was alive. His testimony is emphatic that no consent to a marriage was ever given by the appellant.

We stated in State v. Newman, 66 Mont. 180, 188, 213 Pac. 805, 807:

"The necessary consent need not be expressed in any particular form. Section 5697, Rev. Codes 1921. In a proper case it may even be implied from the conduct of the parties. University of Michigan v. McGuckin, 64 Neb. 300, 89 N.W. 778, 57 L.R.A. 917. But the consent, whether in express words, or implied from conduct, must always be given with such an intent on the part of each of the parties that marriage cannot be said to steal upon them unawares. * * * The words manifesting the consent may be spoken in the face of the church, or immediately preceding an

act of sexual intercourse, as claimed in this case. But they must always be spoken by those who know and intend that matrimony in full form shall be the result. Marriage cannot be created piecemeal. It comes instantly into being, or it does not come at all. If anything remains to be done before the relationship is completed in contemplation of the parties themselves, there is no marriage.

" 'In order to constitute a marriage *per verba* [*de*] *praesenti*, the parties must agree to become husband and wife presently. The consent which is the foundation and essence of the contract must be mutual and given at the same time, and it must not be attended by an agreement that some intervening thing shall be done before the marriage takes effect, or that it be publicly solemnized. That is to say, it must contemplate a present assumption of the marriage status, in distinction from a mere future union. Lord Brougham in Queen v. Millis, 10 Cl. & F. 534, 708, 730; Clark v. Field, 13 Vt. 460. Beneficial Ass'n v. Carpenter, 17 R.I. 720, 24 A. 578.''

We have then the situation where appellant contends that she consented to the purported marriage, and maintains that it took place in June of 1932 upon a date of which she is not certain.

As was stated in Welch v. All Persons, 78 Mont. 370, 386, 254 Pac. 179, 183:

"Every lawful marriage must have been entered into by the parties at some particular time. It does not result from mere cohabitation alone. 'As a general rule, when a marriage is sought to be proved by conduct, cohabitation and repute, the date of the marriage in fact, which such conduct and repute tends to establish, is the date of the commencement of such conduct and repute, and not afterwards'. Williams v. Williams, 46 Wis. 464, 1 N.W. 98, 32 Am. Rep. 722.''

This being the law it was incumbent upon the appellant to prove by a preponderance of the evidence that the conduct, cohabitation and repute commenced at that time, and that by her conduct she had given her consent. It is admitted that intercourse occurred on the night of the purported marriage,

and a witness did testify that on the return to the ranch for a few days the parties occupied the same bed, but the record is devoid of any conduct by either party upon their return to the ranch which would tend to establish a marriage. The appellant testified that she did not inform the children of the respondent, who were living on the ranch at that time, that she was married to their father, and did not in any manner claim to be so married. Nothing appears in the record to show repute in the community or neighborhood that they were married, it does not even appear to be reputed in the very household in which they were then residing.

As was stated in Elliott v. Industrial Accident Board, 101 Mont. 246, 254, 53 Pac. (2d) 451, 454:

"One of the disputable presumptions in this state is 'that a man and a woman deporting themselves as husband and wife have entered into a lawful contract of marriage'. Subdivision 30, sec. 10606, Rev. Codes 1921 [R.C.M. 1947, section 93-1301-7].

"The so-called 'common-law marriage' is recognized as valid in this state, but, to be effective there must be the mutual consent of parties able to consent and competent to enter into a ceremonial marriage, and the assumption of such relationship, by consent and agreement, as of a time certain, followed by cohabitation and repute."

Thus the parties must enter upon a course of conduct to establish their repute as man and wife. This course of conduct cannot be partial, it must be complete and sincere. Appellant would have us believe that by agreement secrecy was maintained at the ranch, among the people of their community, and with regard to relatives of the respondent, but that holding themselves out as man and wife in hotels, motels, and other living quarters in places distant from the ranch where the parties had little, if any, acquaintances, establishes repute.

When we speak of repute we mean reputation, being the acter and status commonly ascribed to one's actions by the public. The evidence in this case falls far short of establishing a reputation by appellant and respondent as being wife

and husband. Instances of cohabitation and registration for living quarters in communities away from the home abode of the parties, of which the record is replete herein, can support the conclusion of meretricious relations as easily as any other. The burden of establishing the marriage was on appellant, and her testimony is filled with instances of secrecy and deception with regard to her relations with respondent in the presence of those whose knowledge would establish reputation.

It appears that appellant desired to accept a portion of the obligations of marriage, and to retain much the same way of life she had always sustained. She retained her maiden name in all her goings and comings with regard to her pupils in school, their parents and the school boards who employed her. Her voting registration, at Windham, which she maintained was her home, was in her maiden name; her withholding certificate; the insurance policy she had issued, and all her mail bore her maiden name. In fact, everything about and pertaining to the community where she claimed to reside indicated she was an unmarried woman.

Appellant places much emphasis on the letters and cards received from respondent as admissions by him that they were married. He freely admitted he wanted to marry her, but she always refused. As this court stated in O'Malley v. O'Malley, 46 Mont. 549, 558, 129 Pac. 501, 503:

"The only evidence of mutual consent of the parties to the alleged second marriage is contained in appellant's narrative of the proceedings before Father Blaere and necessarily involved in his denial. But assuming that there was a mutual consent, did the appellant make out a *prima facie* case of 'mutual and public assumption of the marital relation?' We think not. Counsel have been unable to furnish this court with any authorities specifically construing this phrase, perhaps because the words are their own interpreter. To us it means a course of conduct on the part of both man and wife toward each other and toward the world as that people generally would take them to be married. Indispensable to this is cohabitation; and we say

with the Supreme Court of California that 'by cohabitation is not meant simply the gratification of the sexual passions, but to live or dwell together, to have the same habitation, so that where one lives and dwells there does the other live and dwell also'. Kilburn v. Kilburn, 89 Cal. [46] 50, 26 Pac. 636, 23 Am. St. Rep. 447; In re Yardley's Estate, 75 Pa. 207; Sharon v. Sharon, 79 Cal. [633] 670, 22 Pac. 26, 131; Hinckley v. Ayres, 105 Cal. 357, 38 Pac. 735.

"Turning, now, to the evidence on behalf of appellant only, we find that after the alleged second marriage Michael O'Malley and the appellant never lived together but maintained separate abiding places; that he visited her in her own house with more or less frequency, sometimes staying overnight, and when he did so the parties occupied the same bed; that this continued for a period of over two years, after which she moved away, and the parties never even visited; that only once did she ever sleep with him in his own house; that he bought her supplies and gave her money; that he told two persons that she was his wife, and to others he referred to her as his wife. It is unnecessary to go into the matter at greater length. Suffice it to say, the evidence is far short of establishing that consistent and public course of conduct toward each other as husband and wife, that 'treatment of each other in the usual way with married people', that cohabitation which we hold to be necessary to constitute a mutual and public assumption of the marital relation. Hinckley v. Ayres, supra."

While appellant contends that when marriage has been shown, whether regular or irregular, and whatever the form of proof, the law raises a strong presumption of its legality. A similar contention was made in In re Gill's Estate, 23 Cal. App. (2d) 212, 72 Pac. (2d) 771, 773, but the court after stating that the presumption did not arise upon a mere showing that the parties had lived together as man and wife, said: "It was necessary to further show that the parties 'by their conduct to each other and to the world thus established a common, uniform, and undivided repute that they were married'. In re Estate of Baldwin, 162

Cal. 471, 488, 123 Pac. 267, 274; see, also, Quackenbush v. Swort-figuer, 136 Cal. 149, 68 Pac. 590; Hinckley v. Ayres, 105 Cal. 357, 38 Pac. 735; White v. White, 82 Cal. 427, 23 Pac. 276, 7 L.R.A. 799.''

While appellant contends that the rule of uniform and undivided repute within the community, if invoked in all cases, can work a hardship in certain instances, no such instances appear in this case. From the record here at any time over a period of seventeen years the appellant could have had the benefit of a cremonial marriage had she desired it. She did not desire it, that was her own decision.

We have many times stated: ''This court will not reverse the findings of the lower court unless the evidence clearly preponderates against them. Anaconda Nat. Bank v. Johnson, 75 Mont. 401, 244 Pac. 141; Warren v. Senecal, 71 Mont. 210, 228 Pac. 71; Allen v. Petrick, 69 Mont. 373, 222 Pac. 451.'' Wills v. Morris, 100 Mont. 514, 50 Pac. (2d) 862, 866.

The trial court observed the demeanor of the appellant, the respondent, and the various witnesses who testified in this cause, and found that in the year 1932 the appellant and respondent were not married by mutual consent and agreement verbally expressed, and that no marriage ceremony of any kind had ever been solemnized between them; that they did not mutually and publicly assume the marital relation; that they did not and never had conducted themselves toward each other and toward the world in such a manner so that the public generally would take them to be man and wife; and that they had not established by their conduct to each other and to the world a common, uniform and undivided repute that they were married.

There is substantial testimony to support these findings of the trial court. The judgment of the trial court is affirmed.

We desire to comment that the transcript in this cause does not contain an index of the exhibits as required by section 3, Rule VIII of the rules of the Supreme Court. By reason of the vast number of exhibits and voluminous record this has

188

the vast number of exhibits and voluminous record this has to sustain.

MR. JUSTICES CASTLES, BOTTOMLY, ANGSTMAN, and ADAIR, concur.