WELCH, APPELLANT, v. ALL PERSONS, RESPONDENTS.

(No. 6,445.)

(Submitted April 6, 1929. Decided May 31, 1929.)

[278 Pac. 110.]

Cause submitted on briefs of Counsel.

*Mr. Louis P. Donovan* and *Mr. W. E. Keeley,* for Appellant.

*Mr. Homer G. Murphy* and *Messrs. Hurd, Hall & McCabe,* for Respondents.

MR. CHIEF JUSTICE CALLAWAY delivered the opinion of the court.

This is the second appeal in this case. The facts set forth in the opinion on the first appeal (78 Mont. 370, 254 Pac. 179) will not be restated, but will be added to, in this. The controversy, it will be remembered, is over the succession to a tract of land in Toole county which Hiram J. Rhodes at the time of his death occupied as a homestead and to which he was not yet entitled to patent. His daughter Agnes Welch and her husband Art Welch completed the steps necessary to

patent and it was issued by the United States to the heirs of Hiram J. Rhodes, deceased.

Agnes Welch brought this action, claiming to be the sole heir of her father. She died and Art Welch, her sole heir, was substituted as party plaintiff.

After the case went back to the trial court the defendants jointly filed two amended answers. In the second amended answer they admitted the marriage of Hiram J. Rhodes and Mariah R. Rhodes in 1857, and that Agnes Welch was the fruit of that marriage. They alleged that on or about the year 1873 Hiram J. Rhodes and Esther O'Brien married; "that defendants, after investigation, have been unable to ascertain the exact time and place of said marriage but are informed and believe that such marriage took place on or about the fourteenth day of February in the year 1873, in the town of Stockbridge, Wisconsin"; that thereafter Hiram J. Rhodes and Esther O'Brien continued to be and were husband and wife until the death of Hiram J. Rhodes on December 8, 1913; that Hiram E. Rhodes, Mabel Rhodes, now Mabel Knapp, and Minnie Rhodes, now deceased, were the issue of the second marriage. They then alleged that Hiram J. Rhodes died intestate, leaving surviving him as his heirs Esther Rhodes, his wife, Agnes Welch, a daughter, Mabel Knapp, a daughter, Hiram E. Rhodes, a son, and Minnie Burch, a daughter, who died about the month of July, 1918, leaving surviving her several children who are named. As a consequence, they alleged that Agnes Welch is entitled to an undivided one-twelfth interest in the property and that the others are entitled to interests in accordance with the laws of succession of this state. The plaintiffs denied all of the foregoing allegations except as to the death of Hiram J. Rhodes, that his daughter Agnes Welch survived him as an heir, and that Esther Rhodes, Mabel Knapp, Hiram E. Rhodes and Minnie Burch were living at the time of the death of Hiram J. Rhodes.

The court found, as it did upon the first trial, that the plaintiff and the defendants Hiram E. Rhodes and Mabel

Knapp are each entitled to a one-fourth interest in the property, and that the heirs of Minnie Burch are entitled to the remaining one-fourth interest. The court deemed the proof sufficient to establish a common-law marriage between Hiram J. Rhodes and Esther O'Brien "approximately in the year 1873," but found the so-called common-law marriage to be "null in law"; concluded that the validity of the common-law marriage "is not material so far as the legitimacy of these defendants is concerned," and that defendants are "presumed to be legitimate." Decree followed accordingly. The plaintiff has appealed.

In legal effect plaintiff's case in chief upon the second trial was substantially the same as upon the first.

Plaintiff having rested, the defendants by stipulation of counsel introduced the testimony given by Hiram E. Rhodes and Mabel Knapp upon the first trial. In addition Hiram E. Rhodes gave testimony, supplementing that given by himself and Mabel Knapp upon the first trial, showing the cohabitation of Hiram J. Rhodes and Esther Rhodes, or Esther O'Brien Rhodes, and tending to show they treated each other as husband and wife, held themselves out to the public as such, and that Hiram recognized the children of Esther as his. But witness' testimony did not go back farther than '78 or '79, as he expressed it.

In rebuttal plaintiff testified to declarations made by Mariah R. Rhodes that she was never divorced from Hiram J. Rhodes. These declarations were numerous, the witness testified, and as late as 1897. Mariah R. Rhodes died in 1899.

Photostatic copies of records on file in the Pension Bureau of the Department of the Interior at Washington, duly certified by the Commissioner of Pensions, were introduced in evidence over the objection of defendants. It appears from these that Esther O'Brien in 1860 married Edward O'Brien who died at Nashville, Tennessee, on December 6, 1863, being then a member of Company I, 21st Wisconsin Infantry. Esther O'Brien, the soldier's widow, was awarded a pension under certificate No. 22270.

On the twenty-fifth day of September, 1884, at Redwood Falls, Minnesota, Esther O'Brien and Hiram J. Rhodes gave testimony in form of depositions, which they severally signed, before James F. Williamson, a special examiner of the pension office, the subject of the inquiry being whether Esther was still entitled to her pension. At that time she testified that she had three children, Minnie, age fifteen, Hiram, age thirteen, and Mabel, age three. She swore that she and Rhodes were not living together as man and wife. "He makes his home here with me and we have lived in the same house for about eleven years except occasionally when he is away. This is his home and when he is in the vicinity he comes here." Asked "Who is the father of these children?" she answered, "I do not know as they have got any father. Q. Is not Hiram J. Rhodes the father of these children? A. Not that I know of. I don't know who their father is." She said she had not lived with any man as husband. Asked categorically as to who was the father of each of the children she replied, "I don't know," and as to whether other men had had the opportunity to become the father of the children, she responded, "I presume that such a thing may have been." Asked by what name the children went she said, "I don't know; I call them by my name," and said she clothed and fed them; that Rhodes never bought anything for them that she knew of.

Hiram J. Rhodes testified that he was then a married man and the name of his wife was "Rosetti Maria Rhodes. Her maiden name was Welch." He said he had not lived with his wife for eighteen years, but was never divorced from her, nor was she divorced from him to his knowledge. "Q. Do you know a woman by the name of Esther O'Brien, or Esther Rhodes? A. I know a woman by the name of Esther O'Brien; she is also called Mrs. Rhodes by the neighbors; I never call her Rhodes and never sign her name Rhodes." He said he had known Esther since she was a child and had never been married to her; he did not know who was the father of the children. Asked certain intimate questions he answered: "I neither admit nor deny it." He testified that sometimes the

children called him "father" or "papa;" but denied that he supported them. "Q. Have you not lived with and treated this woman, Esther Rhodes, or Esther O'Brien, as your woman, or your wife for the past three years or more? A. No, sir. I deny that I have."

On the fifteenth day of July, 1885, Esther O'Brien again testified before the special examiner. She said she did not care to make any change in the testimony she had given before him during the preceding fall. She said, "As I have had all these children since soldier's death, I know that I have lost my title to pension. Without admitting who was the father of the children I admit the children. I herewith abandon all my claim to pension. I do not want any more bother with it."

On the 10th of October, 1885, she asked to be restored to the pension roll. In an affidavit made before the clerk of the district court of Redwood county, Minnesota, she described herself as Mrs. Esther O'Brien, widow of the late Edward O'Brien. She swore, "I have not remarried since the death of my husband, nor have I lived with Mr. Hiram Rhodes, who is my cousin, or any other man as his wife since my husband died. Soon after Mr. O'Brien's death being sickly I was advised by my physician to get married and have children and it would improve my health. But I did not want to get married again. All the Indians were drunken and I did not expect a white man would marry me. For the sake of my health I concluded to bear the reproach of having illegitimate children. I procured this to be brought about for this purpose and no other and the result aimed at was secured. I have had of course the additional labor required to take care of these children. I do not think it necessary for me to state who was the father of my children. They are respectively 16, 14 and 4 years of age."

On the 12th of October, 1885, Rhodes made an affidavit in which he swore that he had known Mrs. Esther O'Brien since she was two years old: "She is my cousin. We grew up together as brother and sister. After her husband died she lived with her father at Stockbridge, Wisconsin. I employed

her to work for me at $1.00 per week at housework for about four years after I came here. I carried on farming during that time. Since then when I have been at this place I have made my home at her house and boarded there, paying her for the same. I knew nothing about the paternity of her children. She has never remarried. I have never lived with her as her husband, nor have I had adulterous cohabitation with her. She has uniformly behaved herself and kept a quiet orderly house, and has not been openly immoral in her conduct. She is a member of the Stockbridge Reservation, Indians and half breeds. Her habits have without any denial on her part been similar to those of women of her own tribe or nation. * * * I have never assumed any authority over her children and never attempt to correct them. Her boy has worked for me at haying and herding cattle and I have paid either him or his mother for all work. I have no claim on him whatever.''

On October 9, 1885, Erastus Welch made an affidavit in which he said: ''I am a brother of Mrs. Esther O'Brien, the widow of the late Edward O'Brien. * * * Hiram Rhodes is our cousin. We all moved here from Stockbridge, Wisconsin, about thirteen years ago. We belong to the Oneida tribe. After the death of her husband Mrs. O'Brien lived with her father until we came to Minnesota. Since we have been here I for five years continuously after arriving at Redwood Falls lived in the same house with my sister Mrs. O'Brien on a rented farm near the village. Mr. Rhodes worked the farm and my sister did his housework, for which he paid her. * * * They are not and never were married nor have they lived together as husband and wife; and to the best of my knowledge and belief there has been no adulterous intercourse between them.''

On October 11, 1916, Esther O'Brien executed a declaration for a widow's pension, in which she declared herself to be the widow of Edward O'Brien, testifying that she was married to him on June 29, 1860; that he died December 8, 1863; ''that she was not divorced from him, and that she has not remarried

since his death.'' The declaration is witnessed by Minnie Burch and Frelove Rhodes, and was sworn to by Esther O'Brien before a notary public. Frelove Rhodes was a relative of Hiram J. Rhodes by marriage.

1. Defendants objected to the introduction of these depositions on the ground that they are not properly authenticated or certified. But this is not tenable.

Section 488, Chapter 8, Title 5, United States Code Annotated, provides that the Secretary of the Interior, the head of any bureau, office or institution or any officer of that department, * * * may furnish authenticated copies of any records, papers or documents within his custody. The Commissioner of Pensions is an officer of the Department of the Interior. (Sec. 1, Chap. 1, Title 38, U. S. C. A.) He is the head of the Pension Bureau. Section 490, Chapter 8, Title 5, U. S. C. A., provides that all authenticated copies authorized under section 488 shall be admitted in evidence equally with the originals thereof. The copies offered in evidence were authenticated by the signature of the Commissioner of Pensions, and were attested by the use of the proper official seal, as authorized by section 491 of Chapter 8, supra. As such they were entitled to be received in evidence under the express authority of section 10568, Revised Codes 1921.

2. Objection also was made that no proper foundation had been laid for the introduction of the depositions and the same were not proper rebuttal. The court overruled the objection, and properly.

The depositions were admissible in rebuttal of the case made by defendants who had attempted to show the existence of a common-law marriage between Hiram J. Rhodes and Esther O'Brien. The method of proof was by showing the conduct of the man and woman said to have been the parties to the marriage, long since dead. ''When the fact of marriage is in issue, whether a consensual or a ceremonial marriage—the subsequent conduct of the man and woman said to have been parties to it, is receivable to evidence the marriage.'' (1 Wigmore on Evidence, 2d ed., sec. 268.) The converse necessarily

is that plaintiff had the right to show by the conduct of the parties that the marriage did not exist. What the parties said and did in relation thereto during the period which is the subject of inquiry is part of the *res gestae.* We think the *res gestae* in this case extended over the entire time between February 14, 1873, the date defendants allege to be the date of the marriage, at least down to the time when the parties ceased to live together, which was some time in the year 1899. "The conduct of the parties during that entire time is part of the transaction, and whatever either party did or said during that time, which sheds light upon the matter and aids in disclosing the relations the parties sustained, and understood that they sustained toward each other, must be construed as part of the *res gestae.*" (*Burns* v. *Smith,* 21 Mont. 251, 69 Am. St. Rep. 653, 53 Pac. 742; *Eisenlord* v. *Clum,* 126 N. Y. 552, 12 L. R. A. 836, 27 N. E. 1024.)

Section 10511, Revised Codes of 1921, provides that where the declaration, act or omission forms part of the transaction, which is itself the fact in dispute, or evidence of that fact, such declaration, act or omission is evidence as part of the transaction.

Cohabitation of the parties was shown to have existed. That was a part of their conduct. But the fact of cohabitation is equivocal, being consistent either with a marital or a meretricious relation between the parties.

"Whether the circumstances should weigh in favor of the marriage relation or against it is open to explanation, and would depend upon the manner and intent of the parties so cohabiting. The character of the cohabitation, therefore, becomes material." (*Drawdy* v. *Hesters,* 130 Ga. 161, 15 L. R. A. (n. s.) 190, 60 S. E. 451.)

Clearly the statements made by Hiram and Esther were admissible to characterize the cohabitation and to refute the existence of a marriage between them.

3. They were admissible for another reason, which also admits the declaration of Erastus Welch.

Section 10513, Revised Codes of 1921, provides: "The declaration, act or omission of a member of a family, who is a decedent, or out of the jurisdiction, is also admissible as evidence of common reputation, in cases where, on questions of pedigree, such reputation is admissible." And under the provisions of subdivision 4 of section 10531, evidence may be given upon a trial of "the act or declaration, verbal or written, of a deceased person in respect to relationship, birth, marriage or death of any person, related by blood or marriage to such deceased person." These statutes recognize one of the well-known exceptions to the hearsay rule. The declarations are made admissible under what is called the necessity rule. (See 3 Wigmore on Evidence, 2d ed., secs. 1421, 1481.) "Where the evidence offered is the declaration of an individual member of the family, the necessity for this person's hearsay lies merely in the impossibility of procuring the declarant himself to testify on the stand." (3 Wigmore, sec. 1481.)

The doctrine of the common law as generally accepted is that the declarations contemplated by section 10513 and subdivision 4 of section 10531 to be admissible must have been made *ante litem motam,* that is, they must have been made before the controversy arose, and under circumstances which point to their trustworthiness, or to put it another way, which do not gainsay their reliability. "Declarations made during the course of a controversy are to be regarded as lacking in the guarantees of trustworthiness," observes Mr. Wigmore. (Sec. 1483.) "The existence of the controversy alone may create partisanship which may be sufficiently aggressive to warrant withholding any reliance upon them." (Jones' Commentaries on Evidence, 2d ed., sec. 1127.) But Professor Jones quotes (sec. 1129) with approval from the opinion in *Halvorsen* v. *Moon Lumber Co.,* 87 Minn. 18, 94 Am. St. Rep. 669, 91 N. E. 28, in which it is said: "Upon principle and authority it must be held, and we so hold, that the true test is not whether the declarations were made *ante litem motam* but whether they were made under circumstances justifying the conclusion that there was no probable motive to

falsify the facts declared.'' ''This,'' says Professor Jones, ''seems a better test than the arbitrary line which is drawn between the time when there was no controversy and the time when it may be said to arise.'' (See Wigmore, sec. 1484.) With this we agree; this doctrine seems consistent with the intention of the statutes quoted, which do not place any limitation upon the admissibility of the declaration. The vital question is, the circumstances considered, is the declaration worthy of belief—how much, if any, weight should be accorded it? Manifestly all the surrounding facts and circumstances must be taken into consideration in determining that question.

But the declarations were made *ante litem motam.* The subject matter concerning which the depositions were made is not the subject matter of this suit. The controversy during which the declarations were made was over the question whether Esther O'Brien, receiving a pension as the widow of her soldier husband, had remarried, or was living in a state of open and notorious adulterous cohabitation. (22 Stats. at Large, 345; Title 38, Chap. 3, sec. 199, U. S. C. A.) She sought to disprove both. The controversy here is whether the children and grandchildren of Esther O'Brien have the right to succeed to interests in a specific tract of land as the heirs of Hiram J. Rhodes. It is true the question of a marriage between Hiram and Esther was involved to some extent in the pension controversy. It is the determinative question in this case.

4. As to the status of the several declarants: Esther at least was a member of the family of defendants.

Counsel for defendants say if Hiram was not married to ▮ Esther he was not a member of the family and therefore his declarations are not admissible; but defendants having alleged that Hiram was a member of the family cannot now be heard to object to his declarations which are tantamount to denying that he was a member of the family. (*Estate of Friedman,* 178 Cal. 27, 172 Pac. 140; and see *Estate of Heaton,* 135 Cal. 385, 67 Pac. 321; *Estate of Hartman,* 157 Cal. 206, 21 Ann. Cas. 1302, 36 L. R. A. (n. s.) 530, 107 Pac. 105; *Washington* v. *Bank for Savings,* 171 N. Y. 166, 89 Am. St.

132

Rep. 800, 63 N. E. 831.) Moreover, Hiram was related to defendants by blood. He was Esther's cousin.

Erastus Welch was Esther's brother.

5. Esther's declaration of October 11, 1916, is admissible for another reason. If she were the widow of Hiram the declaration was one made against her interest (sec. 10514, Rev. Codes 1921), for under the provisions of the United States statutes she could have obtained patent for the land which is the subject of this suit. (See Title 43, Chap. 7, sec. 164, U. S. C. A.)

6. As said above, the weight to be accorded declarations of this character must be determined by the court. (*Estate of Friedman,* supra.) "Testimony of this character should be accepted with caution and scrutinized with great care." (*Welch* v. *All Persons,* supra.) Written declarations, especially those made under the sanctity of an oath, generally are entitled to greater .credence than oral declarations which necessarily must be recounted by someone who heard them and whose memory may be defective. "Though the witness who testifies to the oral statement may be honest, his memory may be at fault, or he may have failed to comprehend and interpret the statement as it was intended to be understood by the speaker. * * * Moreover, so easy is it to fabricate such evidence that there is strong temptation to a dishonest, interested witness to do so. (17 Cyc. 806, and notes.)" (*Escallier* v. *Great Northern Ry. Co.,* 46 Mont. 238, Ann. Cas. 1914B, 468, 127 Pac. 458; *Marcellus* v. *Wright,* 65 Mont. 580, 212 Pac. 299; *Sylvain* v. *Page,* 84 Mont. 424, 276 Pac. 16.)

7. Upon the record there is no reasonable doubt that Hiram J. Rhodes and Mariah R. Rhodes were never divorced. A prior marriage being shown undissolved, casts upon the relationship of Hiram J. Rhodes and Esther O'Brien, in the absence of proof of a marriage between them, the shadow of illegitimacy, as we said when this case was here before. Upon this showing the law's favorite presumption of innocence disappears, and the presumption of wrongdoing takes its place;

the burden rests upon those asserting legitimacy to show a subsequent marriage. In attempting to carry this burden they have endeavored to show a common-law marriage. Assuming such would have been recognized in Wisconsin in 1873 when defendants allege a marriage was consummated between Hiram J. Rhodes and Esther O'Brien (*Williams* v. *Williams,* 46 Wis. 464, 32 Am. Rep. 722, 1 N. W. 98), we do not find the proof sufficient to establish it.

Marriage is defined by our statute as a "personal relation arising out of a civil contract, to which the consent of parties capable of making it is necessary." (Sec. 5695, Rev. Codes 1921.) This terse definition embraces the essential elements recognized by the authorities generally. (See 38 C. J. 1272 et seq.; 18 R. C. L. 381 et seq.)

The consent of the parties must be mutual. (*Shepherd & Pierson Co.* v. *Baker,* 81 Mont. 185, 262 Pac. 887.) While the consent need not be expressed in any particular form (sec. 5697, Rev. Codes 1921), as we said in *State* v. *Newman,* 66 Mont. 180, 213 Pac. 805, it must always be given with such an intent on the part of each of the parties that marriage cannot be said to steal upon them unawares. "One cannot become married unwittingly or accidentally. The consent required by our statutes, as well as the statutes of every state, and by the common law, must be seriously given with the deliberate intention that marriage result presently therefrom." There must be an agreement between the parties that they will hold toward each other the relation of husband and wife with all the responsibilities and duties which the law attaches to such relation, otherwise there can be no lawful marriage." (*Williams* v. *Williams,* supra.) The absence of such consent renders the relations of the parties meretricious. (38 C. J. 1316.)

A marriage cannot arise from the mere cohabitation of two persons who are merely reputed to be husband and wife; such cohabitation and reputation are merely evidence of the existence and reality of the consent. (38 C. J. 1299.)

The fact that a man and woman have cohabited is not enough; the fact that children have been born to them is not enough. (*Welch* v. *All Persons,* supra.) Unfortunately, people do sustain meretricious relations from which children result. The law indulges presumptions to cover up these sordid relations and to save the offspring from the imputation of illegitimacy, will draw the shield of protection about them whenever it can do so without violence to the facts. The law will imply consent from the habit, the conduct of the parties when the facts will permit; it presumes that a man and woman deporting themselves as husband and wife have entered into a lawful contract of marriage (sec. 10606, Rev. Codes 1921), but this presumption fades away in the face of contrary facts. Here, in addition to the presumption of illegitimacy which follows from the showing of a prior marriage undissolved, we have competent evidence that the couple had declared under oath that they never have been married, and the mother swearing that the children are illegitimate. Moreover, in her deposition made in 1884, she swears to statements which, if true, show Minnie was born in 1869, and Hiram in 1871, and she made the same statements in her 1885 deposition. Defendants allege the marriage took place in 1873. If the children were born before the marriage, the relationship of the parents was illicit in the beginning, which imposes upon the parties asserting the legitimacy of the children the burden of showing that the unlawful relationship changed to a lawful one. (*Howard* v. *Kelly,* 111 Miss. 285, Ann. Cas. 1918E, 1230, 71 South. 391; *Welch* v. *All Persons,* supra.)

Hiram J. Rhodes being married to another woman when the ▮▮▮▮▮▮ marriage was alleged to have been contracted between himself and Esther O'Brien, was then incapable of contracting a marriage with her. (*In re Huston's Estate,* 48 Mont. 524, 139 Pac. 458; *Welch* v. *All Persons,* supra; *Shepherd & Pierson Co.* v. *Baker,* supra.) To be sure, he might have entered into a pretended contract of marriage with Esther O'Brien, she being capable of entering into marriage with him and intending in good faith to marry him—for illustration, he

might have gone through the form of a ceremonial marriage with her, or, following an actual and mutual agreement to marry her, have publicly assumed marital relations with her. Thus there would have been a marriage "null in law," and the children would have been legitimate. (Sec. 7074, Rev. Codes, 1921; 7 C. J. 948; 3 R. C. L. 723.) There is no such case here. We have here the unusual situation of both parties to the alleged marriage declaring under oath that it did not exist. And under the circumstances it would seem probable, almost certain, that each knew of the other's declaration. Esther declared she was not married to Hiram; Hiram declared he was married, but not to Esther. Ordinarily a mother will not willingly place the stamp of illegitimacy upon her children; it seems inconsistent with human nature. But the books show numerous instances where mothers have done so. Esther's declarations must be accorded some weight although we think they are false in some particulars. There is no doubt that she falsified respecting the paternity of the children, but this cannot be said as to her testimony respecting a marriage with Hiram. It should be noted that in her deposition of July 15, 1885, wherein she said she did not desire to change any statement made by her in her deposition made nine months before, she was no longer attempting to retain her pension; she said she did not care to bother with it any further.

It seems likely that Hiram also falsified respecting the paternity of the children, but clearly he did not falsify as to the marriage because he was then married to another woman and was incapable of marriage with Esther.

Welch, a brother of Esther, and a cousin of Hiram, lived with them when the alleged marriage was in existence, observed their conduct, and declared they were not married. He deposed that he had no interest in the controversy and it does not appear that he was an interested witness.

All of the declarations which appear in the depositions introduced in evidence by the defendants are hearsay and none of them, with the exception of one, possibly two, are entitled to admission in evidence. But if all were entitled to admis-

sion they would go no further than to establish the presumption of a marriage between Hiram and Esther, and some of them, including the one clearly entitled to admission, are equivocal upon that score, which to say the least weakens the probative force of the testimony. (*Shepherd & Pierson Co.* v. *Baker,* supra.)

The finding of the lower court that there was a common-law marriage between Hiram J. Rhodes and Esther O'Brien which was null in law, cannot be sustained. It rests solely upon a disputable presumption and this—that a common-law marriage existed between them—is swept away by the overwhelming weight of plaintiff's case.

Upon the proof Agnes Welch was the sole heir of Hiram J. Rhodes, and plaintiff, her sole heir, is entitled to judgment as prayed for in the complaint.

The judgment is reversed with direction to the district court of Toole county to enter judgment accordingly.

ASSOCIATE JUSTICES MATTHEWS, GALEN and FORD concur.

MR. JUSTICE ANGSTMAN: I dissent. In my opinion there was sufficient competent evidence in the case to justify the finding of the learned trial judge that a common-law marriage existed between Hiram J. Rhodes and Esther O'Brien, entered into approximately in the year 1873, and that the issue of that marriage are legitimate under section 7074, Revised Codes of 1921.

I am unable to attach importance to the depositions of Hiram J. Rhodes and Esther O'Brien taken before James F. Williamson, a special examiner of the pension office, or to other statements made by them in an effort to obtain a pension for Esther O'Brien, and which tend to negative the existence of such a marriage. The statements were not made "under circumstances justifying the conclusion that there was no probable motive to falsify the facts declared." On the contrary, they were made at a time when there existed a controversy as to whether Esther O'Brien was married, and when

the granting or withholding of the pension depended primarily upon whether she was married or unmarried. The motive to falsify is apparent. That the witnesses did falsify in some material matters is equally obvious. The statements of these witnesses in the depositions are so obviously false in some particulars, and their efficacy is so destroyed by self-contradictions and evasions that they are unworthy of belief in respect to the question whether a marriage existed between the parties.

In my opinion the judgment should be affirmed.